JENNIE S. GORDON, *Appellee,* V. LILLIE GORDON MUNN et al., *Appellants.*

No. 17,725.

SYLLABUS BY THE COURT.

1. DIVORCE — *Decree in Foreign Court — Pleadings — Collateral Attack.* A wife domiciled in Missouri began an action in a circuit court of that state against her husband, a resident of this state, for divorce. Service was made by publication. The husband did not appear and a judgment for divorce was rendered, as prayed for. The proceedings were regular according to the laws of Missouri, unless the verification of the petition was insufficient, the affidavit bearing date thirty-three days before the petition was filed. It is held that the Missouri court had jurisdiction, and the judgment for divorce is not open to collateral attack in an action in a district court of this state.

2. EVIDENCE—*Judgment—Publication Service—Parol Evidence.* Where a judgment rendered by publication is offered in evidence in a collateral action in the same court in which the judgment was rendered, and the affidavit on file shows by its

Gordon v. Munn.

recitals that the publication was insufficient, parol evidence is admissible to prove that due publication was in fact made.

3. QUIETING TITLE—*Land in Arkansas—Effect of Judgment.* In an action to quiet title to land in Arkansas, where service was made by publication and the defendant did not appear, she is not bound beyond the property which was the subject of that suit. Title to land in this state is not affected by the judgment of the Arkansas court in that action.

4. ANTENUPTIAL CONTRACT—*Pleadings—Issues.* Where the execution of an antenuptial contract pleaded by a defendant is denied under oath and the execution of a like contract differing but slightly in its material terms is alleged in the reply, the issue is not restricted to the execution of the contract as pleaded by the defendant.

5. —— *When Not Set Aside.* If the intended wife is competent to make a contract and has a fair and adequate knowledge concerning the future husband's property when she enters into an antenuptial agreement, which is free from deceit or fraud, it should not be set aside merely because the court or jury find that the provision made for her is in great disproportion to his property.

6. SETTING ASIDE ANTENUPTIAL CONTRACT—*Evidence.* In an issue arising upon an allegation that an antenuptial contract had been canceled and destroyed by mutual consent of the parties thereto, declarations of the husband, since deceased, were admitted in evidence in behalf of the widow tending to prove that the contract had been destroyed and canceled by mutual consent of the parties thereto. The adverse party then offered other declarations of the husband tending to prove the contrary, which were rejected. The evidence showed that the instrument had been destroyed and the intent of the parties concerning its destruction was material. It is held that the rejected evidence should have been received.

Appeal from Shawnee district court. Opinion filed July 6, 1912. Affirmed in part and reversed in part.

*James A. Troutman, D. R. Hite, Robert Stone, David W. Mulvane, C. E. Gault,* and *George T. McDermott,* all of Topeka, for the appellants.

*S. H. Allen, Otis S. Allen,* and *J. B. Larimer,* all of Topeka, and *A. E. Crane,* of Holton, for the appellee.

40—87 KAN.

The opinion of the court was delivered by

BENSON, J.: This is an action for the partition of land by the widow against the daughter of the deceased owner of the land.

G. S. Gordon, a widower 72 years of age, owning property of the value of about $55,000, contracted a marriage with the appellee, then 36 years of age, who had been married and divorced and whose property was of little value. The marriage took place on June 30, 1898, immediately after the execution of an antenuptial agreement. Mr. Gordon died March 26, 1908, leaving appellant Lillie Gordon Munn his only heir at law except the appellee.

The answer contained a general denial and pleaded (1) a former marriage of the appellee with one Richmond, from whom the appellee had obtained a decree of divorce in the state of Missouri, but in a court that had no jurisdiction, without the issuance and service of process as required by the laws of that state; (2) a later marriage with one Starr, from whom she was not legally divorced, although a pretended decree therefor had been obtained from the district court of Shawnee county, without jurisdiction and without the service of process; (3) an antenuptial contract whereby the appellee had waived all right, title, interest and inheritance in the property of her intended husband in consideration of two parcels of real estate of which she became the owner by virtue of such agreement; and (4) a decree of a circuit court of Arkansas quieting title in the daughter of the deceased, defendant in this action, to land in that state owned by Mr. Gordon at the time of his death, in which action, it is alleged, the title to the lands involved in this action was adjudicated.

The reply alleged the validity of the divorces referred to and averred that the courts in which they were granted had jurisdiction of the parties and sub-

ject matter; that the appellee was never subject to the
jurisdiction of the circuit court in Arkansas, and that
that court had no jurisdiction of the subject of this
action, and had proceeded solely upon service by pub-
lication to quiet title to lands in Arkansas only.   In
the reply the appellee denied under oath the execution
of an agreement as pleaded in the answer, but alleged
that an antenuptial contract had been entered into by
the terms of which Mr. Gordon had agreed to convey
to the appellee by deed forthwith to be executed two
pieces of real estate to be her sole property, together
with the rents and profits, but that he had never made
such conveyance but kept, controlled, enjoyed and used
the property as his own until his death, collecting,
keeping and using as his own the rents therefrom.
She also alleged that this property was of the value
of only $2500, while Mr. Gordon then owned prop-
erty of the value of $80,000, but that she was not in-
formed and did not know the nature or amount of his
property, except his homestead and the property so to
be conveyed to her; that the contract was drawn up
without her knowledge by Mr. Gordon's attorney and
she was requested to sign it on the day of the marriage,
when it was first shown to her, Mr. Gordon then
promising to convey the two pieces of property to her
immediately.   Upon these facts, more fully stated in
the reply, it is alleged that the agreement is not en-
forceable against her, because of the failure of her hus-
band to make the conveyance or to give her possession or
dominion of the property or the rents, and because it
was unreasonable, and was procured by concealment
and without a fair disclosure of the husband's property.
It is further alleged in the reply that after living with
her husband for several years the appellee first learned
of the amount of his property and then repudiated the
agreement, which was thereupon destroyed in his
presence with his knowledge, upon the agreement that
it should thereby be annulled and canceled, both par-

ties relieved wholly from its obligation, and that she should have the rights of a widow in his property at his death.

The first trial was by the court and judgment was given for the plaintiff, which was reversed because of the denial of a trial by jury. (*Gordon v. Munn*, 83 Kan. 242, 111 Pac. 177.) The second trial was before a jury, which returned a general verdict for the appellee with special findings, upon which judgment was again rendered for the plaintiff. The abstract contains seventy specifications of error, which may, however, be fairly considered in a few propositions embracing material points.

After hearing the evidence relating to the divorces obtained by the appellee the court held and instructed the jury that they were valid; that her marriage with Gordon was legal; and that she was his widow. The attack upon the decree rendered in Missouri is based upon the fact that Mr. Richmond was never a resident of Missouri, and that the judgment rendered against him by publication was without jurisdiction. It is not disputed that the plaintiff in the action was domiciled in Missouri, and the proceedings appear to be regular according to the laws of that state unless the verification of the petition was insufficient. The date of the affidavit is thirty-three days before the petition was filed and it is contended that this fact avoids the service and defeats jurisdiction, but it was held otherwise in *Aherne v. Investment Co.*, 82 Kan. 435, 108 Pac. 842. The decree was not open to collateral attack. (*McCormick v. McCormick*, 82 Kan. 31, 107 Pac. 546.) The only defect alleged in the decree of divorce against Starr is that the affidavit for publication, although examined and approved by the court when the judgment was rendered, was void because it showed that the notice had not been published for the length of time required by the statute. The court allowed the testimony of the publisher to be given on the trial of this

action, from which it appeared that the publication had in fact been made for the requisite time. This evidence was properly received. (*Lipscomb v. Bank,* 66 Kan. 243, 71 Pac. 583; *Morris v. Hardie,* 84 Kan. 9, 113 Pac. 308.) Again it is contended that both the Missouri and Kansas divorces are void because the publication notices did not run in the name of the state. The same contention was made in *McKenna v. Cooper,* 79 Kan. 847, 101 Pac. 662, but not sustained. That decision is adhered to. The same rule appears to prevail in Missouri. (*Hansford v. Hansford,* 34 Mo. App. 262; see, also, *Doan et al. v. Boley et al.,* 38 Mo. 449.)

The district court held that the Arkansas decree was insufficient as a defense. The answer in this action averred that the petition in that action contained an allegation that the appellee had not been legally divorced from Starr—that the pretended decree of divorce from him was void "for want of jurisdiction in the court in which it was granted." The service in the Arkansas suit was by publication only and the appellee, then and now a resident of this state, did not appear. A copy of the decree attached to the answer recites the default and a finding that the allegations of the petition are true. The judgment purported only to quiet title to the Arkansas land situated within the jurisdiction of that court. That judgment, relating solely to lands in that state, can not affect title to lands here. (2 Freeman on Judgments, 4th ed., § 564.)

"The judicial determinations of a state can have force and operation in another state, only so far as the court promulgating such determinations has jurisdiction over the persons or things to be affected by such determinations." (*Amsbaugh v. Exchange Bank.* 33 Kan. 100, 105, 5 Pac. 384.)

The contention that the decree in the Arkansas case reciting that the averment in the petition that the Starr divorce was void conclusively establishes the in-

validity of that divorce in this action can not be sustained. It was held in *Iles v. Elledge,* 18 Kan. 296:

"The recitals of a judgment *in rem,* obtained without personal service in a sister state, and by publication only, where none of the defendants to the suit make any appearance in the court rendering the judgment, are no evidence of debt, nor evidence of tender of a deed, in a separate action pending in this state between the same parties to recover upon a promissory note." (Syl. ¶ 1.)

The judgment referred to in the above quotation was rendered in an action for specific performance. In all such cases of constructive service the defendant is not bound beyond the judgment relating to the property in question or subject of the suit. (Herman on Estoppel, §§ 518, 522.) Title to land in this state can not be affected by the decree of a court of another state. (*Cooper v. Ives,* 62 Kan. 395, 63 Pac. 434.) This rule is recognized in *Reber v. Wright,* 68 Pa. St. 471; *Price v. Hickok,* 39 Vt. 292; *Cooper v. Reynolds,* 77 U. S. 308; and *Durant v. Abendroth,* 97 N. Y. 132.

Upon the issue relating to the antenuptial contract it is insisted that having denied the execution of the agreement, as pleaded in the answer, the allegation in the reply that a different although similar agreement had been made was immaterial, and that the evidence should have been limited to the averment in the answer and denial in the reply. Both parties alleged the existence of an antenuptial agreement, but the appellants averred that by its terms appellee became at once, upon its execution, the owner of the property described therein, while the appellee alleged that it was an executory agreement for a conveyance which did not vest the title, and that the possession, use and dominion of the property had been retained by her husband. The appellee was not limited to a mere denial of the execution of the contract as pleaded by the appellant, but could and, in a system of practice which

requires facts to be pleaded, properly did set out the contract as she understood it, the paper having been destroyed. Even if the ruling should be held erroneous under strict rules of pleading no prejudice resulted. The only witness to prove the contents of the agreement was called by the appellant. Both parties accept his version as true and the jury found that it was as alleged by the appellee.

The special findings of the jury in substance were that the plaintiff is the widow of G. S. Gordon; an antenuptial agreement was made, as alleged in the reply, which was carefully read and explained to the appellee before she signed it; Mr. Gordon did not in any manner conceal the fact that he owned other property; her life had been one of hardship; and she was at the time serving as an attendant in a state hospital, earning $22.50 per month besides board; she knew the kind of home he occupied; and the prospect of being relieved from the necessity of earning her own living was an inducement to accept his offer of marriage, whereby she secured a better home than she had ever had before. She was an experienced woman of mature years, fully capable of managing her own affairs, and might by the exercise of slight effort have ascertained the fact that her prospective husband owned considerable real estate in Topeka and vicinity and knew that he was in good circumstances. She fully understood the terms of the contract and expressed satisfaction therewith, and Mr. Gordon did not do or say anything to induce her to sign it. She considered the prospect of a comfortable home, an assured social position and the property referred to in the contract a fair provision in view of her own situation, without regard to Mr. Gordon's ownership of other property, and was satisfied with its terms and effect when she signed it. Since the marriage she has received from her husband conveyances for the homestead (in the city), 120 acres of land, and $1000 in money. The antenuptial agreement

was destroyed by Mrs. Gordon just after Mr. Gordon's recovery from a severe illness. (Spring of 1902.) The contract contained an agreement of Mr. Gordon to convey to her the two pieces of property described therein but the conveyance was never made and he did not carry out or perform its terms on his part. In addition to these findings the jury answered questions as follows:.

"Did such antenuptial contract make fair and reasonable provisions for the plaintiff, Jennie S. Gordon? Answer: At the time it was, but as the widow of G. S. Gordon it was not.

"Taking into consideration the previous social position and financial condition of plaintiff as shown by the evidence, was the marriage contract of June 30, 1898, unreasonable or unfair to her? Answer: It did not make reasonable provision for her widowhood."

It appears from the evidence that Mr. Gordon died on March 26, 1908. The appellee contends that she is not deprived of her inheritance as a widow by the antenuptial contract because it was never performed by her husband.

On the other hand the appellant contends that upon the execution of the agreement and the marriage of the parties the equitable title vested in the wife, which could not be defeated by any act of the husband; that the contract was as conclusive upon him and his heirs as the most formal warranty deed; and that the wife, having never demanded a conveyance, should be considered as consenting that the naked legal title should remain in the husband.

The purchaser of land in possession under an agreement for a conveyance is considered the owner in equity, subject to the payment of the purchase money, and the vendor is treated as the trustee of the legal title. (*Jones v. Hollister*, 51 Kan. 310, 32 Pac. 1115; *Gilmore v. Gilmore*, 60 Kan. 606, 57 Pac. 505; *Campbell v. Town Co.*, 69 Kan. 314, 76 Pac. 839.) The fact that possession was not transferred in this instance may

Gordon v. Munn.

be accounted for by the relationship of the parties. It is not uncommon for a husband to manage his wife's property, and in the absence of any evidence to the contrary it may be presumed that such control and management is with her consent. No request for possession or the control of the property is shown.

Authorities are not wanting to support the proposition that when an intended husband has failed to make a conveyance as agreed in such a contract, the decree will not be specifically enforced at the suit of his heir, although it would be at the suit of his widow. In many of the cases holding that such an agreement thus remaining unexecuted does not bar the widow's dower or inheritance, the inexperience of the wife, her want of adequate knowledge of the husband's property or other equitable considerations appear to have influenced the judgment. In this case the woman was of mature years and the findings negative any deception or fraud. She knew that her intended husband was in good circumstances. The provisions of the contract were explained and she understood its terms, conditions and effect.

It was held in *Hafer v. Hafer,* 33 Kan. 449, 6 Pac. 537, that marriage settlements of this character are looked upon with favor, and are to be liberally interpreted to carry out the intention of the parties. Applying this rule, which has become the judicial policy of this state, it can not be held in the circumstances disclosed by the findings that the fact that a formal conveyance was not made is sufficient to defeat the agreement. The property to be conveyed in equity belongs to the widow. The rents and profits have been absorbed by the taxes, and she will have all the benefits that a previous conveyance would have given.

The failure to make a conveyance as agreed is, however, a circumstance to be considered in determining another issue in the case. The appellee pleaded that the contract had been canceled and annulled by mutual

consent, and several questions were submitted to the jury upon that issue upon which they found that the contract was destroyed by Mrs. Gordon after a severe illness of her husband. They were asked to state "whether or not said contract was canceled or destroyed by the mutual agreement of the parties thereto." To which they answered: "On account of contradictory evidence it is hard for us to determine just what happened to the contract or what was done with it."

It is the opinion of this court that in view of the general verdict this answer should be considered as relating to the document—the paper itself—rather than to the agreement. The actual destruction of the paper would be competent evidence upon that issue in connection with the accompanying circumstances, but if the contract was canceled by agreement, that is, if the parties mutually agreed that it should be annulled and no longer be in effect, the destruction of the paper upon which it was written was not controlling. In view of the probable misapprehension of the jury of the real intent of the question, and of the fact that even if the meaning was understood no real answer was given, it is believed that an important issue of fact in this case has not been definitely decided and that justice requires that it should be submitted upon another trial.

It will be observed that the court asked the jury to find whether the antenuptial contract was fair and reasonable. It was held in the Hafer case that if the parties are competent to contract, and the agreement, considering the circumstances, is reasonable and just in its provisions, it will be upheld. Without attempting now to settle the apparent ambiguity in the findings of the jury upon this matter, it is deemed proper to say that the court, instead of submitting to the jury the general question whether the agreement was reasonable, as the instructions indicate, should have explained to them her right to contract, and his duty to

make a fair disclosure of his property and financial situation, and submitted to them the question whether she had been reasonably well informed of his property and had entered into the agreement with a fair knowledge of his financial condition. If the intended wife is competent to make a contract and has a fair and adequate knowledge concerning the future husband's property when she enters into an antenuptial agreement which is free from deceit or fraud, it should not be set aside merely because the court or jury find that the provision made for her is in great disproportion to his property.

In determining whether the antenuptial contract was canceled or annulled by mutual agreement, as alleged in the reply, all the circumstances of the situation tending to prove the intention of the parties should be considered. These include the failure to make the conveyance before referred to, the conveyances of other property which the evidence shows were made to the wife, the age and enfeebled condition of the husband, the care and attention of the wife, their feelings toward each other, the disposition made of the instrument, and every other fact having a natural relevancy to the inquiry. Consent to a rescission of a contract may be implied from the circumstances and conduct of the parties with respect to the subject matter. (*Evans v. Jacobitz*, 67 Kan. 249, 72 Pac. 848.)

In view of the fact that a new trial of this issue is to be allowed it becomes necessary to refer to evidence offered by the appellants upon that question and rejected. After the testimony of a witness who said that he was present when the contract was destroyed, tending to prove that it was done by mutual consent, was received, the testimony of other witnesses was given purporting to relate statements of Mr. Gordon that he and his wife had destroyed the contract so that she should get her share of his property, and other similar statements tending to prove a cancellation of the

agreement by mutual consent. Thereupon the appellant offered the testimony of witnesses purporting to relate other statements of Mr. Gordon tending to prove statements that the contract was lost and that he had not consented to its destruction. This rebutting testimony was rejected on the ground, as alleged, that it was self-serving.

Declarations of a person since deceased against his pecuniary or proprietary interest are admissible although the declarant is not a party or in privity with a party to the action. (*Mentzer v. Burlingame,* 85 Kan. 641, 118 Pac. 698.) It is insisted, however, that this rule does not necessarily permit the admission of other declarations made by the same person to the contrary. It is the general rule that the declarations first referred to are admitted because against the interest of the declarant while those last referred to are rejected because self-serving. It remains to consider whether this general rule should be applied in the situation now presented. The question to be determined was whether the contract was destroyed by mutual assent in order to abrogate the agreement, or by one party only and without the consent of the other and without any intention on his part to annul it. The declarations of the husband, as testified to by the appellee's witnesses, tended to show that the agreement had been destroyed by mutual assent with the intention thereby to abrogate it. Testimony of other declarations of the husband was offered tending to the contrary. Conduct is constantly shown to prove intention, and declarations, if not within the rule requiring rejection because they are self-serving, may be shown for the same purpose. Even when self-serving, they are admitted in evidence if part of the *res gestæ* and declarations of an occupant of land which import title in himself are admissible as verbal parts of his occupation. (*Liebheit v. Enright,* 77 Kan. 321, 94 Pac. 203.)

Professor Wigmore in a discussion of impeaching

Gordon v. Munn.

testimony offered in rebuttal of dying declarations says that "almost all courts have agreed, therefore, that a self-contradiction may in this situation be offered, although the preliminary question [required in case of an attempted impeachment of a living witness] has of course not been asked and can never be." (2 Wig. Ev. § 1033.) After other observations on this subject the author adds: "Wherever any other statements are admitted, by exception to the hearsay rule—for example, statements of *facts against interest*—the same principle is applicable, and the requirement of prior asking should be dispensed with." (2 Wig. Ev. § 1033.) It is argued that the rejected testimony falls under this rule, *i. e.*, the rule relating to impeaching evidence, and appellant insists that it should have been admitted on this ground. It is doubted whether this is the best reason. Impeachment by proof of self-contradiction is based upon the supposed capacity or disposition of the declarant to err through mistake or dishonesty, and the relation of contradictory declarations is permitted in order that a comparison may be made in finding the truth. (2 Wig. Ev. §§ 1017-1040.) It is probable that the argument intended to be drawn by the appellant from the rejected testimony is that the appellee's witnesses were mistaken or dishonest in their report of his conversations. In other words, it was not a comparison of one statement with another, but rather an effort to show that the deceased did not make the statements attributed to him by the appellee's witnesses by showing that he had made contradictory statements to appellant's witnesses. But the purpose for which the evidence was offered—which was not stated—is not very important. The real question to be considered is whether it had probative force. If it fairly tended to show the intention of the deceased with respect to the destruction of the instrument or the abrogation of the contract, no good reason is apparent for its rejection. Why should it not be left to

the jury, after hearing the various witnesses relate the declarations attributed to the deceased, to find what his statements really were, and what they proved concerning the intent of the parties to the contract, in the transaction referred to?

In a case where the issue was whether a promissory note had been given to the maker by the payee, the defendant, the maker of the note, was allowed to prove the declarations of his brother, since deceased, who held it, that he intended to make the gift, and it was held that evidence of other declarations of the deceased of an intention to insist upon payment of the note should also have been admitted. The court said:

"The intent of a person to do or not to do any given thing can only be shown by his acts, declarations and conduct, and when declarations are introduced in evidence tending to show such intent, other and subsequent declarations tending to show a contrary intent, made prior to the consummation of the act, are admissible· for the purpose of enabling the jury to determine what in fact the intent of the person was, and thus making it probable or improbable that the act, whatever it may be, in controversy was consummated in accordance with the expressed intent of the party." (*Sherman v. Sherman,* 75 Iowa, 136, 138, 39 N. W. 232.)

It is true that a different situation is presented here. The declarations in that case related to intention before the act had been done. Here they related to a past transaction. But this is true of the declarations offered by both parties and it is believed does not necessarily affect the principle. Another difference however should be noted. In that case the court was careful to observe that a different rule might prevail if the intent referred to might disturb a vested right. It is true a person may not, after making a gift or other disposition of property, jeopardize the title given or right surrendered by declarations to the contrary. (*Pentico v. Hays,* 75 Kan. 76, 88 Pac. 738.) The evidence, however, is not admitted for that purpose, but to show whether other

declarations already in evidence expressed the real purpose of the party in the transaction, in other words, to show his intention.

In another case of an alleged gift statements of the supposed donor, who died before the trial, made at different times before and after the alleged gift and which were inconsistent with it, were held admissible to contradict the testimony of the donee although not made in his presence. (*Whitwell v. Winslow,* 132 Mass. 307.) The court said that the declarations, although in some sense in favor of the party making them, and in the nature of hearsay, ought to have been admitted upon principles declared in *Whitney v. Wheeler,* 116 Mass. 490. In that case the court held that statements of a deceased person indicating a previously fixed state of mind inconsistent with an alleged gift were admissible when there was ground to doubt the intent with which the property had been delivered. In the case last cited the statement related to an intention existing before the alleged gift, but in the former the same rule was apparently extended to cover statements made after as well as before that time.

In a case involving the question of a parol gift to a son-in-law who relied upon possession and the declaration of the alleged donor, evidence of his counter declarations was allowed. The court said:

"Where declarations have been heard, counter declarations can not be excluded for the reason that the mind has reached a conclusion as to the truth of the case. This the verdict of the jury alone can reveal. Such evidence is somewhat analogous to the testimony of different witnesses to the same transaction." (*Stone v. Stroud,* [S. C.] 6 Rich. 306, 309.)

Where evidence of confidential statements of a testator had been related by a witness for one of the parties, the court admitted the testimony of another witness purporting to give other statements of the testator tending to show that the first witness was not on the terms of intimacy with the testator which his

own testimony tended to show. (*Lightner and others v. Wike*, [Pa.] 4 S. & R. 203.) It must be conceded that the evidence so held admissible was quite remote, but the opinion says that it tended in some degree to contradict the assertion of the first witness and to show the improbability of his testimony.

The declarations excluded on the trial of this case are not direct evidence of the fact in issue but they tend to show the intent of the deceased respecting it, or, as some writers say, his particular mental state, and for that purpose have probative force, the weight of which is for the court or jury trying the fact. (16 Cyc. 1186.)

At the conclusion of an illuminating discussion of exceptions to the hearsay rule, Wigmore quotes briefly from judges and authors who have lamented that the declarations of persons since deceased were not received in all cases when they would be admissible if the persons were living. (2 Wig. Ev. § 1576.)

Without impairing the force of the general rule excluding self-serving hearsay declarations, it is held that the statements offered by the appellant do not fall under the ban of that rule in the circumstances disclosed upon the trial of this case.

The special findings do not sustain the contention that the contract is invalid because of any suppression of information or other misconduct of the other contracting party. The issues concerning the validity of the marriage and the effect of the Arkansas judgment are properly determined. The only remaining issue to be tried is upon the annulment of the contract as alleged in the reply.

The judgment is reversed and the cause remanded for a new trial of that issue.