Conry v. McLean, *Administrator, et al.*

---

## No. 25,080.

JESSE CONRY, *Appellee,* v. B. F. McLEAN, as Administrator, etc., of the Estate of T. J. HOLDRIDGE, deceased; THE FIDELITY NATIONAL BANK AND TRUST COMPANY, of Kansas City, as Executor of the Estate of FRED D. LARABEE, deceased; THE PRUDENTIAL TRUST COMPANY, of Topeka, as Executor of the Estate of FRANK S. LARABEE, deceased; and CLARA F. HOLDRIDGE, as Administratrix of the Estate of T. J. HOLDRIDGE, JR., deceased, *Appellants.*

### SYLLABUS BY THE COURT.

CONTRACT—*Secret Process of Manufacturing Gasoline—Error of Trial Court—Evidence—Instructions—Special Findings.* The proceedings considered in an action to recover the price contracted to be paid on acceptance after demonstration of a secret process for manufacture of gasoline, and *held,* the court erred in respect to exclusion of evidence, admission of evidence, instructions given the jury, and approval of special findings of the jury.

Appeal from Sedgwick district court, division No. 3, JESSE D. WALL, judge. Opinion filed February 7, 1925. Reversed.

*Justin D. Bowersock, Robert B. Frizzell* and *Guy Vernon Head,* all of Kansas City, Mo., for appellant The Fidelity National Bank and Trust Company; *Robert Stone, George T. McDermott, Robert L. Webb,* and *Beryl R. Johnson,* all of Topeka, for appellant The Prudential Trust Company; *T. A. Noftzger, Benj. F. Hegler, George W. Cox,* all of Wichita, for appellant Clara F. Holdridge.

*Chester I. Long, Austin M. Cowan, Claude I. Depew, Thomas C. Wilson, Henry Lampl,* all of Wichita, *John H. Atwood,* and *John Hyde,* both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover the price stated in a contract proposing sale of a secret process for manufacture of gasoline. Plaintiff prevailed, and defendants appeal.

The contract was signed on August 26, 1918, by plaintiff, Jesse Conry, owner of the process, who for convenience may be called seller, and by Frank S. Larabee, Fred D. Larabee, T. J. Holdridge, Sr., and T. J. Holdridge, Jr., who for convenience may be called buyers. The contract provided for enlarging and improving an experimenting and demonstrating plant already in existence, at a cost not to exceed $500, to be paid by the buyers; for a fifteen-day test run, at buyers' expense, but under seller's supervision, to demonstrate practicability of the process for profitable manufacture of gasoline; for acceptance or rejection of the process by buyers at the end of the test run; for payment of $57,500 to seller by buyers in case of acceptance; and for nonrevelation of the secret process by buyers in case of rejection. A copy of the contract is appended to this opinion.

The experimenting plant was put in readiness, and a test was made on September 13, 14 and 15, 1918, but neither acceptance nor rejection of the process was announced by buyers. On October 4, 1918, Holdridge, Sr., died. On October 16, 1918, the surviving buyers assigned their interest in the contract to F. L. Slaughter. Early in November, 1918, H. J. Wilson became interested with Slaughter and negotiated with the seller for the process. Wilson testified that, after tests at the experimenting plant during a period of about five weeks, the seller being present part of the time, Wilson dropped negotiations.

Between November 4, 1918, and May 24, 1921, the seller wrote letters to the Larabees and to J. C. Pixley, which disclose the following facts: The seller did not consider that the buyers had accepted the process pursuant to the contract of August 26, 1918, and the test run, but he claimed to be owner of the process, with absolute dominion over it, including right to permit others to use it, and right to prosecute Slaughter and Wilson should they use it. The seller considered he had right of dominion over the experimental plant, was apprehensive that one J. L. McCabe, who will be identified later, was scheming to "freeze him out"; spent several weeks previous to January, 1919, trying to make the plant serviceable; went to the plant, which was located in Independence, in January, 1919, with the intention of moving it to Olathe; and in April, 1919, was willing to make J. C. Pixley an attractive offer to run the plant for the seller, if Pixley would help clear the title. (Mechanics' liens for improvement of the plant had been filed, which

were subsequently foreclosed.)    As early as November, 1918, the seller had information relating to the Larabees wanting to dispose of the contract and being induced to get out.  The seller believed the Larabees had been misinformed, and added to a letter written at Independence and dated November 5, the following significant statement:

"We can make 60 B product now any day on a steam still just installed. No loss in volume (gallons)."

About two weeks before November 21, 1918, the seller considered giving a new option to Holdridge, Jr., Wilson and Slaughter, and he testified that at that time Wilson told him Wilson, Holdridge, Jr., and Slaughter were buying the Larabees out.  On November 21, 1918, the seller proposed to the Larabees that they join him in putting in a gasoline plant in a certain natural gas field, and as an inducement suggested that he might allow the Larabees to use the process somewhere independently of him.  On April 5, 1920, Fred D. Larabee died.  On May 15, 1921, Holdridge, Jr., died.  On May 24, 1921, the seller wrote Frank S. Larabee, sole surviving buyer, stating the seller had a gasoline plant, with a capacity of from 2,000 to 4,000 gallons per day, in operation; that he wanted to sell a controlling interest for $8,000, and asking if Larabee would be interested.  On June 8, 1921, Frank S. Larabee died.  On February 23, 1922, the seller sued the personal representatives of the deceased purchasers for the purchase price of the process.

Seller and buyers were brought together for negotiation of the contract by J. L. McCabe.  He testified he acted at solicitation of the Larabees.  In October, 1917, the seller gave McCabe a contract for use of the process in three states.  McCabe testified he took the contract in his own name at the suggestion of Fred D. Larabee.  In November, 1917, McCabe transferred his rights under the three-states contract to Holdridge, Jr.  The latter contract was modified by a contract dated August 25, 1918.  The assignment to Slaughter covered the three-states contract, as well as the contract of August 26, 1918, forming the basis of the suit.  The operative portion of the assignment to Slaughter reads as follows:

"Now, therefore the parties of the first part hereby agree for valuable consideration, receipt whereof is hereby acknowledged, that if the party of the second part shall pay to them within twenty (20) days from this date the sum of three thousand dollars ($3,000) cash in hand, they will deliver to the party of the second part the said contracts above mentioned and described,

and duly assign to the party of the second part or any other person he may designate."

The petition alleged that the buyers accepted the process on or about October 16, 1918, the day the then-surviving buyers assigned the contract to Slaughter. In reply plaintiff pleaded that the buyers were estopped to deny they took over the process and assumed and exercised dominion over the process, because of the assignment to Slaughter. There was a jury trial, and a verdict for plaintiff for the contract price of the process, with interest, against all defendants except the personal representative of Holdridge, Sr., who was relieved from liability by a peremptory instruction.

To sustain the issue of acceptance of the process under the terms of the contract, plaintiff produced as a witness Albert C. Lyon, a chemist and chemical engineer of Kansas City, Mo., whose business was conducting laboratories and making tests. He testified that on August 24, 1918, two days before the contract was signed, Fred D. Larabee brought to his office a bottle of what Larabee called synthetic oil, to be tested. Larabee said that Conry had submitted to him a proposition relating to production of synthetic oil by a process which Larabee described to Lyon. Negotiations which resulted in the contract were then pending. Lyon tested the contents of the bottle and made a written report, giving the chemical analysis, and stating that by distilling the product a fair grade of gasoline could be obtained, and by adding casing-head gas the proposition would be promising. This report was admitted in evidence over objection of defendants that the character of the oil analyzed, whether good or bad, and the character of the Conry process, whether good or bad, were immaterial to the issues. Lyon said his report was delivered to the two Larabees, and they asked him for an explanation in detail. He gave such an explanation, which he repeated on the witness stand. He testified he knew the Larabees had casing-head gas plants in Oklahoma, and this would make an A-1 gasoline. As a result of this conference the Larabees engaged him to go to the experimenting plant at Independence to be present when the contemplated demonstration took place, which he did. On September 17, 1918, he made a written report of the demonstration, and the report was introduced in evidence. The conclusion of the report was embraced under the heading, "Remarks and Opinion." Afterward Fred D. Larabee asked for an opinion with reference to commercializing the product, and on September 26 Lyon wrote him

fully, showing that a profit could be made of $600 per day for 300 working days of the year, or $180,000 per year. Subsequently Fred D. Larabee interrogated Lyon further about the cost and yield, and gave Lyon his idea of how to handle the process—form companies at different points in different states, have other people furnish the money, and retain an interest in, each plant—and Lyon testified that from the figures he gave Larabee, Larabee seemed to be pleased with the outlook.

While negotiating with the seller, the Larabees were consulting a patent lawyer, Elliott, of St. Louis, Mo., and Lyon attended a conference between the Larabees and their attorney. Lyon was invited to the conference to see if there were any flaws in the claims for a patent, and he testified to the suggestions which he made.

The casing-head gas plants in Oklahoma, nine in number, in which the Larabees were interested, were in charge of W. E. Burke as manager. Burke received his degree of chemical engineer from the same school which graduated Lyon, and subsequently established a chemical and physical laboratory in which Lyon was assistant and partner. Burke's business in 1918 was oil and gas, and in that year he experimented in reduction of low-grade oils into gasoline. He had made a special study of the subject from many patents, and had installed a "cracking" process in a refinery of which he was manager. The Larabees called him to Kansas City to consult in reference to the Conry process, and he was present at the conference between the Larabees, Elliott and Lyon. Lyon told all that occurred. One incident was that Burke said the Conry claims for patent did not, in his opinion, cover anything at all, and Lyon felt called on to use plain English to Burke, showing him there were processes for making gasoline from kerosene and natural gas, but in a different way.

Fred Larabee received a letter from the patent attorney, dated September 20, 1918, relating to Lyon's report of the test run, and advisability of further tests under conditions which might demonstrate something. Lyon discussed this letter with Larabee, and expressed to Larabee his views on the subject of the letter, which he detailed on the witness stand. There was more testimony of the kinds indicated, but the foregoing is sufficient for present purposes.

Defendants called Burke as a witness. The Larabees had called Burke into conference respecting the process on occasions other than the one mentioned by Lyon. On those occasions he had advised

them respecting the process, had pronounced it worthless, and had recommended that the Larabees drop it. The court declined to permit Burke to testify to conversations with the Larabees unless either Conry or Lyon was present when the conversation occurred. The matter was sharply presented by defendants asking the witness for the first conversation he had with the Larabees in the absence of Conry and Lyon. The ruling sustaining objection to the testimony was followed by an offer of proof which fairly indicated the nature of the evidence, and Burke's affidavit, stating in detail what his testimony would have been, was filed in support of a motion for a new trial.

Defendants called as a witness R. B. Pringle, who was vice president and general manager of the Wade Phillips Company, who was experienced in oil matters, and who was familiar with methods of refining oils and gasolines. He testified that Frank S. Larabee requested him to go to Independence and witness the demonstration of the Conry process, which he did. After the demonstration Pringle discussed the demonstration and the Conry process with Larabee, and gave Larabee his opinion respecting them. He was not permitted to testify concerning conversations with Larabee at which Conry was not present. Proper procedural steps were taken to protect privilege to review the court's action. Defendants offered in evidence the patent attorney's letter, but the court refused to permit the letter to be read to the jury. There was more evidence of the kinds indicated.

We have then this situation: The Larabees called on four persons regarded as experts for assistance and advice in investigating and determining whether the seller had anything to sell, or worth buying. Plaintiff selected one of these experts as his witness. The witness admitted he was a partisan of plaintiff, and, over objection, the witness gave a full account of his relations with his employers, what he saw and did, what he said and wrote and reported, what they said and did, and the attitude of their minds toward the process. When defendants undertook to disclose influences attributable to other agents, which it was believed operated to produce a decidedly different attitude of mind, and to determine conduct, they were denied the privilege.

The contract provided that demonstration of the process should be under direction of the seller. He was present at the demonstration, but it was managed by McCabe, who was financially inter-

ested in its success. The contract provided his commission should be paid by the buyers. What occurred was this: Two boilers had been set up, one as a container of liquid, and the other of vapor, with a circulation system between them. A measured quantity of kerosene was placed in the container. Natural gas from the city main was turned in at half-hour intervals, but the quantity was not measured. Heat and pressure were applied, both so low that even Lyon admitted the stability of molecules would not be affected. At the end of three hours it was discovered that nature had called upon her reserve of inscrutable processes, and had created in this womb of mystery 10½ gallons, or sixty pounds, of new liquid. Lyon admitted the test was crude, but recommended further experiment under improved conditions, and, without explaining the miracle, pictured to the Larabees fabulous profits by use of the process. The patent attorney wrote Larabee that he had read Lyon's report with great interest, noted the 10 gallons increase, and agreed with Lyon the test was inconclusive as to what occurred in practicing the process. Burke's explanation of the increase was very simple. He told Larabee the additional ten gallons had been deliberately introduced by some one. Pringle told Larabee the demonstration was a failure and the process was a fake. Frank S. Larabee said he would have nothing more to do with the process, and on October 16, the buyers disposed of their contract. The seller's conception of the situation following the test which matured the buyers' obligation to accept or reject the process, as revealed in his letters and as held until the buyers were all dead, has been presented. The result is that if fruit of the buyers' relations with one of their agents was important to plaintiff, as bearing on the issue of acceptance or non-acceptance, fruit of the buyers' relations with their other agents was equally important to them.

Plaintiff contends that because Lyon was agent of the buyers, they were bound by his admissions against their interest, made in the course of employment. As applied to the bulk of Lyon's testimony, the contention is refuted in the case of *Railway Co. v. Burks*, 78 Kan. 515, 96 Pac. 950. While that case was a corporation case, and the subject of investigation was cause of an accident and not integrity of a process, general applicability of the principle involved was indicated in one of the authorities cited in support of the decision, and the situation of a principal having several agents to investigate and report to him, in case the reports should differ, was discussed. (p. 523.)

Lyon's testimony went to the jury under the following instruction:

"Practically the sole question for determination by you is as to whether or not the Larabees and Holdridges or any of them accepted the process in question. In this connection, you are instructed that the question as to whether or not the process involved in this action is valuable or not valuable is not an issue in the case. Evidence, however, with relation to whether or not the process was valuable, or what it purported to be, is competent and material so far as it tends to prove or disprove the issue as to whether or not there was an acceptance by the defendants of the process or such an acceptance of the terms of the offer as would constitute a binding contract."

Plaintiff was entitled to the benefit of Lyon's testimony, and the instruction given was correct. The privilege did not extend, however, to license to pick and choose which one of several qualified witnesses should alone furnish testimony of the character indicated, as tending to prove or disprove the issue whether there had been acceptance of the process.

Plaintiff produced as a witness O. H. Swearingen, who was plaintiff's attorney from the time the contract was executed until shortly after November 5, 1918. Swearingen testified that within a month, and possibly within two weeks, after the contract was signed (August 26, 1918), he met the Holdridges on a street corner while he was on the way to lunch, and Holdridge, Jr., said they were going on with the process, but would need more time, as the Larabees had too many irons in the fire. About three or four days after October 11 Swearingen asked Holdridge, Jr., what had been done about the contract, and Holdridge, Jr., said, "Well, we'll take the process. Mr. Conry knows we have taken the process." About twenty days before the death of Holdridge, Sr., Swearingen saw Frank S. Larabee, who said the matter was practically settled, but his brother would be away for a day or two, and he wanted Swearingen to come back when his brother returned. Between October 8 and October 15 Swearingen saw both the Larabees, asked if they had made up their minds, and was told they were of a mind about the process, the process was all right, and they knew they would take the process when they got the contract. It was shown, however, that Swearingen was in communication with his client by letter. On October 5 he wrote a letter saying the Larabees were out of the city, and concluded the letter with, "Have heard they intend to take the process." On October 8 Swearingen wrote, saying one of the Larabees was up in the air, was nervous, and could give no help; that the other

was in Colorado; that Holdridge, Sr., had died, and that Holdridge, Jr., could not be seen for a day or two. On October 15 Swearingen wrote that he had made two trips to the office of the Larabees and neither one was in, that Holdridge, Jr., was not in his office, and that he would see Holdridge, Jr., at 9 a. m. the next day. Swearingen testified he wanted to close the contract, but "they wouldn't set a time for closing." The letters show that as late as October 3 Swearingen's information respecting acceptance of the process was hearsay. There is no report in any of his letters of any conversation with Holdridge, Jr., or the Larabees giving even faint hope of acceptance, and the letter of October 15 shows he failed to secure acceptance before the living buyers disposed of the contract on October 16. The jury made Swearingen's testimony the basis of findings of determination and announcement of acceptance. They might not have done so had the excluded evidence been admitted.

Plaintiff says declarations of the buyers against interest were admissible and their self-serving declarations were not admissible. The statement is true, but it does not dispose of the matter. No buyer ever made to the seller, or to any one for him, anything resembling announcement of decision to take over the process which at that time and by that means constituted definite exercise of privilege to accept or reject, and so fixed the rights of the parties. The petition pleaded acceptance on or about October 16, the date of the assignment to Slaughter. The jury were told that acceptance of the process could be in any manner which indicated desire and intention of the buyers to take over the process, and might be by way of assignment of their interest in the contract without the seller's consent. The verdict and special findings adopted October 16 as the date on which acceptance became indisputable. There was no communication between seller and buyers on that day. The assignment was simply an incident in a course of conduct from which the fact of acceptance or nonacceptance was to be inferred. The probative force of the incident as a fact warranting an inference of acceptance depended, as the court recognized, on desire and intention of the assignors; and as the case was submitted to the jury, statements of the buyers indicating they had no intention or desire to accept the process were very important, and should have been admitted, to be weighed with statements indicating they did have such intention or desire. Besides that, under the circumstances, ascertainment of the real intention and desire of the buyers following

the test would go far toward determining the question of acceptance or rejection of the process. As indicative of probable intention, plaintiff introduced in evidence reports made, advice given, opinions expressed and statements made to and by the buyers in the course of conversations. Letters and other documents would also have been competent, but no writing tending to show acceptance was discovered in the files of the deceased buyers. As indicative of probable intention, defendants tried to introduce other reports made, advice given and opinions expressed to the buyers. They were clearly admissible. Defendants also offered to prove declarations, verbal and written, of the buyers, or some of them, not to establish truth of what was said or written, but to show probable intention, as bearing upon the ultimate issue of acceptance or rejection. After due consideration, the court has reached the conclusion that, under the limitation indicated, to be stated to the jury in the court's instructions, the evidence was admissible. The attitude of the court toward admissibility of such evidence was declared in the case of *Gordon v. Munn,* 87 Kan. 624, 125 Pac. 1.

The jury were asked to state when, where and in what manner each buyer, except Holdridge, Sr., determined and announced to plaintiff, or some one for him, that he desired to take over the process. The answer as to Holdridge, Jr., was, "Thursday, exact date unknown, Eleventh and Main, Kansas City, Mo., to Swearingen." What this conversation was has been stated. It may have occurred before the test run was made.

Swearingen was one of plaintiff's witnesses in chief, and testified to conversations occurring with or in the presence of all four buyers. All the conversations occurred while he represented plaintiff. When plaintiff rested, defendants read to the jury plaintiff's letters, which his counsel had not seen. Plaintiff called Swearingen in rebuttal, and for the first time Swearingen gave the most important conversation of all. After he ceased to represent plaintiff, and one day near Christmas, 1918, he was in Fred D. Larabee's office. Plaintiff was there, and Swearingen listened to a long and loud conversation between Larabee and plaintiff, the pertinent portion of which follows:

"He, Mr. Conry, said, 'You fool around here, and I will close you all out.' Mr. Larabee said, 'You can't do that, Mr. Conry. That process belongs to us. You can't do that.'"

The jury found that at the time and place and in the manner

disclosed by this testimony, Fred D. Larabee determined and announced that he desired to take over the process. Credibility of the witness was a matter for the jury to determine, but the jury's answer was not true. Larabee was not announcing acceptance of a pending offer. He was warning plaintiff that ownership of the process was already a closed subject.

When asked when, where and in what manner Frank S. Larabee determined and announced to plaintiff, or some one for him, that he desired to take over the process, the jury answered: "By failure to reject contract of August 26, 1918, at expiration of time specified." The logic of the answer is this: The contract required Frank S. Larabee to announce at conclusion of the test run whether he desired to take over the process. He did not make an announcement. Therefore he did announce that he desired to take over the process. This finding of the jury was doubtless returned under the influence of an erroneous instruction given by the court, to be considered presently.

The assignment of the contract to Slaughter made on October 16, 1918, expressed just this and no more: On payment of the consideration, the assignors would assign and deliver the contract to the assignee or his appointee. A natural inference from the giving of the assignment was that the buyers did not desire to avail themselves of privilege conferred by the contract to announce acceptance, pay the price, and so acquire the process, and were passing the privilege on to Slaughter. The court, however, by its instructions, sedulously pressed the assignment upon the attention of the jury as sufficient evidence to establish acceptance.

The jury were told that acceptance of the process might be by claim of ownership or exercise of ownership, by way of assignment of interest in the contract. Subsequently the jury were told that an assignment, with plaintiff's consent, to help him clear title to the process—something defendants did not claim—would not "in and of itself" constitute acceptance, and if assignment were made for that purpose, and not "in divesting themselves of any ownership which they had theretofore acquired in said contract," then the assignment could not be considered as tending to prove acceptance. Later the jury were told the buyers could not assign the contract until they had acquired and accepted the process—except to clear title—and unless plaintiff consented, assignment of the contract might be considered as a fact tending to prove acceptance of the

process. In explanation of this instruction the court said the buyers could not get anything which they could transfer until they accepted the process. This instruction was numbered 16. Instruction No. 21 was that as long as the contract remained executory it was not assignable; that until the process was accepted and obligation of the buyers to pay the price became fixed, they could not assign the contract to any other person; and an assignment without plaintiff's consent might constitute acceptance of the process.

In instruction No. 22 the jury were told the buyers had the option to accept the process and pay the price, or to turn back the process and keep it secret; and if the buyers disabled themselves from turning back the process "by selling the same without the consent of Conry," then they were bound to perform the alternative permitted by the option—which meant pay the price.

The court told the jury that, under the contract, it was the duty of the buyers to announce acceptance or rejection of the process, and that failure to announce acceptance would not, in and of itself, constitute rejection. The jury were then advised, in instruction No. 23, to this effect: When property is sold subject to test, failure to reject the property within the time designated in the contract, except there be extension of time by agreement on valid consideration, will constitute an acceptance of the property. In instruction No. 25 the court told the jury the buyers could not assign the contract without plaintiff's consent, because the contract was personal to the buyers, and in instruction No. 27 the jury were told nobody could accept the offer contained in the contract except the buyers to whom it was made.

It would have been strange if this harping on the assignment had not constrained the jury to believe that making the assignment constituted acceptance of the process, but the instructions are open to graver criticism. Interpretation of the assignment was a matter of law for the court. It did not express or profess acceptance of the process, or claim of ownership of the process, or exercise of ownership over the process. The court did not choose to interpret the assignment to the jury, and the instructions which spoke of exercise of ownership by assignment of the contract gave the assignment an unwarranted signification.

Instruction No. 22 was based on a fiction. The contract gave the buyers no option to "turn back the process," as the court said, and it was idle to speak of returning communicated information from

mind to mind, as a physical object might be returned from hand to hand. The instruction served, however, to introduce the subject of a sale of the process without plaintiff's consent. The court gave no instruction advising the jury respecting the legal distinction between sale of the process as property and an assignment of the contract. Without such an instruction the jury were not likely to make the distinction, and were likely to understand the instruction as referring to assignment of the contract.

A portion of instruction No. 22 reads as follows:

"Where a party to a contract has an option between two alternatives, and such party places himself in such a position that he cannot perform one of the alternatives, he will be bound to perform the other."

Plaintiff defends the instruction by citing two decisions. In the case of *Texas & Pacific Railway Co. v. Marlor*, 123 U. S. 687, 702, a railroad company issued bonds secured by mortgage on net income of certain of its lines. The bonds provided for interest at the rate of seven per cent per annum, payable annually on the first day of July of each year. If net earnings in any year were not sufficient to pay seven per cent interest, then scrip might, at the option of the company, be issued for interest. Interest fell due on July 1, 1882 and 1883, and was not paid for lack of earnings. Option to issue scrip was not exercised. In October, 1883, the company undertook to issue scrip, which a bondholder refused, claiming he was entitled to money. The decision was that interest was due and payable on July 1. If interest were not paid in money on that day, the company was bound to exercise its option to pay in scrip, on that day, or lose privilege to pay in scrip.

In the case of *Irving v. Bond*, 76 Neb. 293, the owner of a dwelling contracted for labor and material for improvements, for which he was to pay $1,225; $225 were to be paid in cash, and the remaining $1,000 by conveyance to the contractor of another house. Before the improvements were completed the house was sold for its value, $400. The contractor filed a lien on the dwelling and brought an action either to foreclose the lien or to compel specific performance. Specific performance could not be awarded, and the owner of the dwelling was charged with the contract price of the improvements, $1,225. In the opinion the court said:

"As we understand the contract, and as we have no doubt that the parties understood it, appellants had an option to pay $1,000 of the contract price in money or by conveyance of the property in question. Having voluntarily deprived themselves of the power to make a conveyance, they have now no

alternative but to satisfy their obligation in cash." · (*Irving v. Bond,* 76 Neb. 293, 294.)

There are other decisions of the same tenor, but they have no application to the present controversy.

In each of the cases cited there was a performance day: in one case July 1, and in the other when the improvement was completed. On performance day a definite obligation had to be met: in one case payment of interest, and in the other payment of cost of the improvement. The debtor had choice of methods of discharging the obligation: in one case by cash or scrip, in the other by cash or deed; but the debtor was obliged to discharge the debt by one means or the other, and if he did not or could not adopt one method he was obliged to adopt the other. Under the contract of August 26, 1918, what was performance day, and what was the obligation of the buyers to be discharged on that day, corresponding to the debts in the cited cases? Performance day was at the end of a test run to demonstrate the synthetic gasoline process. The obligation to be discharged was the converse of paying an existing debt. It was an obligation to determine and announce adoption of a course of conduct involving consequential liability. Performance consisted in determining and announcing the adopted course. The buyers had a choice with respect to what course they would adopt and announce. They could choose to accept the process and pay the price, or to reject the process and keep it secret, and they were obliged to adopt and announce one course or the other. What did the buyers do? The petition tells what they did. They exercised their option, adopted one of the alternative courses, and on or about October 16, 1918, accepted the process. By doing so they relieved themselves from all liability for disclosure of the process, and the only liability under which they rested was such as might result from nonpayment of price. Disclosure of the secret was merely an item of evidence tending to prove acceptance. It was not ground of liability for payment of price, and the result is, instruction No. 22 was clearly erroneous and highly prejudicial.

Instruction No. 23 was intended to apply to the process (property), the contract and the test involved in the lawsuit the jury were considering, and the court said failure to reject would constitute acceptance. There was no sale of property subject to test. Whether or not there would be a sale depended on acceptance after test. Failure to reject the process did not constitute acceptance. The buyers became obligated to pay the price if and when they an-

Conry v. McLean, *Administrator, et al.*

nounced decision to take the process. If they made no announce-. ment either way, the penalty was not payment of price. The buyers' remedy was to force decision by demand for announcement, or by tender of performance, either of which would foreclose privilege to purchase unless the buyers paid the price.

The contract gave the buyers no property in the process. The only way the buyers could get property in the process was by announcing acceptance and paying the price. The contract did, however, confer on the buyers privilege to acquire the process by announcing acceptance and paying the price. Until the test run matured obligation to announce acceptance or rejection, the contract was personal to the buyers, because they were intrusted with confidential information. In case of acceptance and payment of price, however, it was of no concern to the seller how widely the secret was bruited, and he could have no personal preference for the money of one buyer rather than the money of another buyer. Therefore, privilege of announcing acceptance and paying the price was assignable by the buyers without the seller's consent. The buyers could not assign to anyone else their obligation to the seller to keep the process secret. That obligation remained until price was paid, and remained in perpetuity in case of rejection. The assignee could acquire no property in the process unless he paid the price. Therefore, assignment jeopardized no interest of the seller, and to forbid assignment would be to deprive the buyers of a valuable right without justification. In any event, assignment of the contract by the buyers, ineffectual as to the seller without his consent, would not necessarily involve or indicate acceptance of the process.

There is a contention that the third paragraph of the contract forbade assignment until after price was paid. There is nothing to indicate the parties had such a purpose specifically in mind, and the effect of the provision was merely that on payment of price the seller would make proper transfer to the buyers or their assignee.

The jury found the buyers exercised dominion and ownership over the process by disclosure of the nature of the process to third persons. Disclosure did not necessarily involve or indicate exercise of dominion or ownership. The contract undertook to protect against disclosure after declared rejection. Whether disclosure involved or indicated exercise of proprietorship depended on a variety of circumstances and considerations, and the finding was doubtless induced by the erroneous instructions relating to assignment. The

. same is true of findings that the buyers were estopped by the assignment of October 16, 1918, from denying that they determined and announced to plaintiff that they desired to take over the process.

The foregoing is sufficient to show the verdict and judgment cannot stand. The court's conclusions respecting some subjects discussed in the briefs will be announced without comment.

The district court had jurisdiction of the action. The action was based on a contract in writing, and the five-year statute of limitations applies. There is nothing in the form or content of the contract establishing agency of one buyer to accept the process for others and so obligate them to pay the price. Notwithstanding death of Holdridge, Sr., other buyers could accept, and any buyer who accepted is liable for the price. Liability to pay price attached on acceptance of the process, and it was not necessary for the seller, on nonpayment of price, to make tender in order to put accepting buyers in default. McCabe was a competent witness for plaintiff. Plaintiff was not a competent witness to show the attitude of Fred D. Larabee toward plaintiff's use of the process at Craig. No inference is to be drawn respecting soundness or unsoundness of instructions requested or given from the fact they have not been referred to.

The judgment of the district court is reversed and the cause is remanded for a new trial.

### APPENDIX.

#### THE CONTRACT.

THIS AGREEMENT, Made and entered into in Kansas City, Missouri, by and between Jesse Conry, hereinafter called the first party, and F. S. Larabee, F. D. Larabee, T. J. Holdridge, and T J. Holdridge, Jr., hereinafter called the second parties, *Witnesseth*:

THAT WHEREAS, The first party claims to have information with reference to a process for manufacturing gasoline from natural gas which is unknown to second parties, but hereafter said first party is willing to impart such information under proper safeguard to the second parties for the consideration hereinafter specified; and

WHEREAS, The parties hereto have installed at Independence, Kansas, an experimental plant for the purpose of using the said process for manufacturing gasoline from natural gas; and

WHEREAS, The second parties are desirous of acquiring the said process and the right to use the same if the use of the same should prove to be commercially profitable;

Now THEREFOR, It is agreed between the parties hereto: *First.* The said experimental plant shall be so enlarged and improved under the direction of

Conry v. McLean, *Administrator, et al.*

the first party, at a cost of not to exceed five hundred dollars ($500), which shall be paid by the second parties, that it will be useful and suitable for the manufacture of gasoline from natural gas by means of said process in sufficient quantities and under such circumstances as to demonstrate whether or not manufacturing gasoline by said process in practicable and profitable quantities.

*Second.* After said plant shall have been so enlarged and improved as aforesaid, it shall be operated for fifteen (15) days at the expense of the second parties, under the direction of first party. Said operation shall begin within five (5) days after the second parties shall have been notified that it has been completed and is ready for operation.

*Third.* At the end of said fifteen (15) days the second parties shall determine and announce to the first party whether they desire to take over the said process or not. If the second parties should announce they do not desire to take over the said process, then they shall surrender the said plant and all rights to the said process to the first party, and this agreement shall be terminated. If the second parties shall announce that they decide to take over said process, then they shall pay to the first party fifty-seven thousand five hundred dollars ($57,500) in cash at the office of O. H. Swearingen, in Kansas City, Missouri, and thereupon first party shall assign and transfer to the second parties, or their assignee, the right to use the said process for manufacturing gasoline from natural gas, and all plants and appliances for plants in connection therewith, and all rights to any improvements or any inventions in connection with said process.

*Fourth.* If the second parties shall not take over the said process as hereinbefore provided, they shall never divulge in any manner any information which they may have received from the said first party, or in any manner in connection with the operation of said plant concerning the nature of said process. In case the second parties shall decide to take over said process as hereinbefore provided, then in addition to payment of said sum of money to the first party, they shall pay J. L. McCabe in full for any and all commission which he may claim for making the sale of said process, so that the first party shall be in no way obligated to said J. L. McCabe in any manner on account of the sale of said process.

*Fifth.* The first party shall not divulge the nature of the said process to any person or persons other than the second parties or their duly authorized agents until the second parties shall have announced as hereinbefore provided their intention to take over the said process, or their intention not to take over said process. If the second parties shall announce their intention to take over the said process, and take the same over in accordance with the terms of this contract, then the first party shall never in any manner divulge the nature of such process to any person or persons, firm or corporation whatsoever, except under the authority from the second parties or their assigns, given either expressly or by implication, and in case he should divulge the nature of such process in violation of this contract, he shall then pay to the second parties the sum of all moneys which have been paid to him hereunder.

*Sixth.* It is mutually understood and agreed, by and between the parties

hereto, that should the second parties fail and refuse to pay the first party for the information obtained, as hereinbefore provided, then the said first party ·shall have the right to enjoin the said second parties, or either of them, or any person claiming by, through or under trem, from the future use of said process, or the sale of the gasoline, the same to be obtained through any court of competent jurisdiction, without bond therefor except such bond as may be required by such court for its costs.

Executed in quadruple this twenty-sixth day of August, 1918.

[Signed]    Jesse Conry.
            F. S. Larabee.
            F. D. Larabee.
            T. J. Holdridge.
            T. J. Holdridge, Jr.