No. 22,021.

LOU WATSON, *Appellant*, v. A. H. WATSON et al., *Appellees.*

SYLLABUS BY THE COURT.

1. ANTENUPTIAL CONTRACT—*Evidence—Findings.* The record is held to disclose evidence sufficient in kind and amount to support the conclusion reached by the trial court.

2. SAME—*Evidence—Communications Made to Attorney.* Certain evidence offered by the plaintiff was rejected because of the incompetency of the witness under section 321 of the civil code respecting things told an attorney by his client. The defendants had taken and filed, but had not used, the deposition of the witness. *Held,* a waiver of the claimed privilege.

3. SAME—*Exclusion of Competent Evidence—No Prejudicial Error.* In a trial before the court, the admission of incompetent testimony, or the exclusion of competent evidence which is cumulative in character, does not work a reversal unless the ruling appears to have furnished some basis for the court's findings.

4. APPEAL—*Matters Reviewable on Appeal.* Save as to original proceedings of which the constitution gives this court jurisdiction, this is an appellate tribunal only, and cannot review matters which have not been presented to the trial court.

5. ANTENUPTIAL CONTRACT—*When to be Upheld—When Burden of Proof is Cast upon the Husband.* An antenuptial contract must be upheld unless some fraud, deceit or unreasonable inadequacy or disproportion appears. If the latter appear, the presumption of fraud is raised, and the burden is on the husband or those claiming under him to show that the wife was fully informed as to his property.

6. SAME—*No Presumption of Fraud.* The claimed inadequacy or disproportion in this case is held not to be so unreasonable as to raise the presumption of fraud.

7. SAME—*Pleadings—Evidence—Contract Upheld.* If the question of the wife's information touching the husband's property had been sufficiently called to the attention of the trial court to justify an appeal on that point, the result reached should have been the same; and as it was not necessary under the pleadings and evidence to ask an express ruling on such question, no material error appears in respect thereto.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed April 12, 1919. Affirmed.

*Chester I. Long, John W. Adams, A. M. Cowan, W. A. Ayres, Earl Blake,* and *S. S. Hawks,* all of Wichita, for the appellant.

*Kos Harris, S. B. Amidon, D. M. Dale, S. A. Buckland, H. W. Hart,* and *Glenn Porter,* all of Wichita, for the appellees.

The opinion of the court was delivered by

WEST, J.: The plaintiff brought this action in partition to recover her claimed portion of the land of her deceased husband. From an adverse judgment, she takes this appeal.

The plaintiff was reared on a farm in Illinois near which F. M. Watson lived for some time. Subsequently, the latter moved to Kansas and settled on a farm near which the plaintiff, then the wife of A. B. Washburn, lived, and they were neighbors for many years. Her husband died in 1907, leaving a will disposing of about $1,500 worth of personal property and about $12,000 worth of real estate, giving it all, except some small bequests, to his widow, but providing that upon her remarriage she was to receive only one-half the property for life, after which it should descend to the children, share and share alike. October 22, 1910, she married F. M. Watson, then a widower, who had previously been married four times, each having grown children. At the time of this marriage, Mr. Watson had property worth from $30,000 to $33,000. He died May 26, 1914. The widow did not take out letters of administration, but declined in favor of Mr. Huff. When this action was begun, the defendants claimed that there was an antenuptial contract between the plaintiff and F. M. Watson, by the terms of which neither should make any claim to the property left by the other.

What was alleged to be a substantial copy of this instrument was set out and made a part of the answer and cross petition. The verified reply especially denied that the plaintiff had ever signed or entered into the alleged contract. The existence of this writing was the principal point on which the voluminous testimony centered, and the court found for the defendants.

It is very earnestly contended that the result was not supported by competent evidence and that much evidence which was admitted was incompetent, and that the entire testimony to prove that such a contract existed was nebulous and foggy, instead of being clear and convincing as required in such mat-

ters; but a careful going over of the entire literature of the case compels us to hold that there was evidence sufficient in kind and amount to support the conclusion reached.

The plaintiff offered the evidence of a very reputable attorney, to the effect that Mr. Watson told him he had no antenuptial agreement with his wife, but it was rejected on the ground that, being attorney for Mr. Watson, who had come to see him about drawing his will, the witness was incompetent under section 321 of the civil code. Very likely such incompetency might have been effectually urged had not the defendants already taken the attorney's deposition and filed it, though they did not use it. In *Golder v. Golder,* 102 Kan. 486, 170 Pac. 803, it was said:

"When plaintiffs called Golder as their witness and examined him under oath, and filed his deposition in court, they thereby waived all proper objections as to Golder's competency to give the evidence." (p. 487.)

By the same token, the defendants here waived any incompetency to the attorney as a witness. (See, also, *Fish v. Poorman,* 85 Kan. 237, 242, 116 Pac. 898; *Bruington v. Wagoner,* 100 Kan. 10, 16, 164 Pac. 1057; 4 Wigmore on Evidence, § 2327.) But ten other witnesses testified to substantially the same statement having been made by Mr. Watson, and as the trial was by the court, and the evidence was received subject to objection and was finally excluded, and would have been merely cumulative if not excluded, it cannot be deemed that it would have wrought any change in the result. Hence, while the excluded evidence should have been received; because of the defendants' waiver its rejection cannot be regarded as material or substantial error. It was said in *James v. Lane,* 103 Kan. 540, 175 Pac. 387, that the admission of certain incompetent evidence in a trial before the court "would not necessarily constitute reversible error, unless it appeared from the record that it furnished some basis for the court's finding." (p. 544.) Unless it appears that the rejection of competent evidence, cumulative in character, furnished some basis for the result reached, it is not ground for reversal.

Both on argument and in briefs counsel for plaintiff have laid great stress upon the proposition that there was no evidence introduced showing that she was informed or advised of

the extent or value of Mr. Watson's estate, or that she had any knowledge thereof. Numerous authorities, including *Gordon v. Munn,* 87 Kan. 264, 125 Pac. 1, are cited in support of the contention that without such a showing as indicated the plaintiff would not be bound by an antenuptial contract, even if one existed.

The defendants, with considerable vehemence, assert that this is a question raised in this court for the first time. In their brief answering the plaintiff's reply brief and additional reply brief, they say, "In the case at bar the question was never before the court in any manner." They also say that the plaintiff, having committed herself to the trial of this case on the theory that no antenuptial contract existed, cannot now ask us to decide that she should have tried her case upon another theory, which "was not raised or suggested at the trial of the case."

In the plaintiff's additional reply brief she quotes from the brief of the defendants:

"There is no testimony that appellant at the time of the marriage knew of the amount of F. M. Watson's estate, of what it consisted, and where it was situated, or that she married him by reason of that estate."

In their brief in reply to this the defendants argue that the plaintiff "knew all about the property of F. M. Watson," and this they say is presumable from the long residence of Mr. and Mrs. Watson in the same neighborhood and their long acquaintance.

Of course, except in original proceedings which the constitution permits to be brought in this court, we sit purely as an appellate tribunal and cannot review matters which have not been presented to the trial court. (*Board of Education v. Jacobus,* 83 Kan. 778, 112 Pac. 612.) Otherwise, we would be acting as a trial court. It remains to be seen, therefore, whether this question was really an issue in the court below.

The action was one for partition. The answer and cross petition set up the alleged antenuptial contract "made prior to said alleged marriage, with full knowledge of each party thereto of the facts therein contained," alleged ownership of the land by reason of its inheritance from Mr. Watson, and a copy of the alleged contract was attached thereto. The reply denied the existence of the contract and the title of the defendants

and, by amendment, alleged that the land was the homestead of F. M. Watson, upon which he and the plaintiff were living at the time of his death, and that the property "is not governed in any manner by the terms and provisions of the said alleged antenuptial contract."

At the close of defendants' evidence plaintiff's counsel demurred thereto on the ground, among others, that "no evidence was offered showing any antenuptial contract has ever been offered or introduced in evidence or made and executed by the plaintiff openly and knowingly or was ever explained to her or fairly made by the deceased husband of this plaintiff by which the plaintiff would be barred from the widow's right or dower in and to his real and personal property." It is stated in the abstract that it "contains all the evidence in full proving or tending to prove that said alleged antenuptial contract was freely and fairly entered into by the plaintiff and F. M. Watson, deceased, or that the same was just and equitable between the said plaintiff and F. M. Watson, deceased." In the journal entry the court found that the plaintiff and her husband entered into the contract "which said contract the court finds was duly and legally made prior to the marriage of the said Lou Washburn and the said F. M. Watson and was just and equitable." One assignment of error is the overruling of the plaintiff's demurrer to the defendants' evidence at the close thereof. Another is that "the court erred in holding that an antenuptial contract had been entered into by plaintiff and F. M. Watson, deceased, prior to their marriage, that was just, reasonable and equitable in its terms." The motion for a new trial alleged that each and every finding, order, decree and judgment of the court was contrary to the evidence and contrary to law.

In the plaintiff's brief it is said that it is not shown that she had any knowledge of the alleged contract until nearly ten months after the death of Mr. Watson, or "that she had any knowledge as to the amount of property of the deceased, and no evidence showing that such an antenuptial contract exisited on May 26, 1914."

In her original brief the plaintiff argues that the contract failed to show any consideration, but showed that as a privilege for making it she forfeited practically all the property acquired from her former husband, and simply took a life estate in an undivided one-half.

Watson v. Watson.

While a liberal construction of these motions, objections and assignments might justify holding that the point under consideration was fairly presented to the trial court, it is quite manifest from the entire record that the battle raged over the existence, and not over the inducement which·led to the signing, of the alleged contract.

But assuming for the moment that the fairness of the alleged contract had to be shown, on whom, if any one, rested the burden to show such fairness or the knowledge of the wife concerning her husband's property? The answer alleged the making of the contract "with full knowledge of each party thereto of the facts therein contained," but nothing was said in the pleadings touching its fairness or the knowledge of the wife touching the husband's possessions. By her former husband's will, Mrs. Watson would, if she remained single, receive the bulk of about $12,000 worth of property, which was to be reduced to one-half thereof for life in case of her remarriage. Even if she were to receive one-half in fee, she would be giving up the difference between one-half of $12,000 and one-half of from $30,000 to $33,000.

The rule seems to be well settled that if unreasonable inadequacy or disproportion appears, the presumption of concealment is raised, and the burden is upon the husband, or those claiming under him, to show full disclosure. The relation between those about to become husband and wife is deemed one of unbounded confidence, especially on the part of the woman. (13 R. C. L. 1034, § 54.)

"Good faith is the cardinal principle in such contracts. If the provision made for the wife is unreasonably disproportionate to the means of the husband, the presumption of designed concealment is raised, and the burden of disproving the same is upon him." (21 Cyc. 1250.)

In *Mann v. Mann*, 270 Ill. 83, it was held that when the provisions of such a contract are disproportionate to the husband's means, it will be presumed that the wife was not fully informed as to her husband's property, and the contract will not be enforced against her unless the presumption is rebutted. There the contract was like the one alleged here, each releasing all right to the property of the other. It was said in the opinion that there was nothing to show what property the husband had, and as there was no proof that the parties were engaged

when the contract was executed, the wife had the burden to show that she did not have full information as to her husband's circumstances. *In re Estate of Enyart,* 100 Neb. 337, was a case involving an antenuptial contract by which the sum of $10,000 was all the wife was to receive from the husband's estate. When the husband died he had paid but $7,500, and the widow sued to recover an allowance of $200 a month pending the settlement of the estate. On appeal by the other side it appeared that the husband was worth about $225,000, was a widower sixty-eight years old, and had no children. The plaintiff when married to him had been deserted by her former husband, was about thirty-four, and had a daughter about fifteen. She had procured a divorce and was working part of the time at the hotel where the deceased stayed. It was said that the evidence was convincing that she knew before the marriage that Enyart was a wealthy man, had farms, banks, and other property, but that it was doubtful if she was informed with any degree of definiteness as to his actual possessions and their value. It was held that the contract was so disproportionate that the burden rested upon those claiming its validity to show that it was entered into with full knowledge on the part of the intended wife. On the other hand, the supreme court of Wisconsin, in *Deller v. Deller,* 141 Wis. 255, held that an antenuptial contract by which the wife was to have $5,000 in lieu of dower and statutory allowances out of the estate of her husband, who was worth about $85,000, would not be set aside for inadequacy. In *Donaldson v. Donaldson,* 249 Mo. 228, an action to set aside two marriage contracts for inadequacy and fraud, it was said in the opinion by Chief Justice Lamm, that the relation of the man to the woman he is about to marry is a confidential one, in an exacting and stringent sense. "He carries the burden of showing that any *antenuptial* contract entered into under the glow and trust of that tender and trust relation was made fairly and understandingly on full disclosures, and is just and adequate." (p. 248.) In *Pierce v. Pierce,* 71 N. Y. 154, the contract provided that the wife should be paid $500 in full consideration of her dower, and that she would not claim any share in the husband's estate, unless such should be given her by will. The husband died without having paid the $500. He had property worth over $25,000. The surrogate

held the contract valid, credited the widow with $500, and allowed her no distributive share of the estate. The general term struck out the credit of $500 and allowed her one-third of the sum to be distributed. This was affirmed by the court of appeals. It was said that the evidence established that the contract was executed by the wife under the belief caused by the husband that it contained more beneficial provisions for her than it did.

"The surrender and release, of rights to be acquired by the intended wife by the marriage relation must, however, be regarded with the most rigid scrutiny; and courts will not enforce contracts of this nature against the wife where the circumstances establish that she has been over-reached and deceived, or been induced by false representations to enter into a contract which does not express or carry out the real intention of the parties." (p. 157.)

It was said that the authorities go very far in holding that strict proof of fairness must be shown when the courts are called upon to enforce such a contract against the wife "and especially when it is apparent that the provision made for the wife is inequitable, unjust, and unreasonably disproportionate to the means of the husband." (p. 158.)

"The rule undoubtedly is, that in such a case every presumption is against the validity of the contract, and the burden of proof is cast upon the husband, or those who represent him, in order to uphold and enforce the same as a valid and subsisting agreement." (p. 158.)

While some have questioned the propriety and validity of antenuptial contracts, it was laid down in *Hafer v. Hafer*, 33 Kan. 449, 6 Pac. 537, that they are not only recognized by our statutes, but that parties contemplating marriage have a right to make them when, considering the circumstances of the parties, they are reasonable and just in their provisions. In that case a widower fifty-six years old, who had accumulated property worth about $14,000, with a family of seven children, all of age but one, in good faith entered into a contract with a woman twenty-six years of age, who was "possessed of two cows and $40.00," by which it was agreed that each should enjoy and have the untrammeled control of his or her own property, as well as the increase and profits thereof, and that if she survived him she would receive from his estate a child's part. It was held that this contract was just and,

reasonable, and that she could not claim one-half of the estate of $19,000. In the opinion it was said:

"We search the record in vain, however, for any testimony that will sustain the finding that there was any deceit practiced by Godfrey Hafer, or that his conversation and conduct in the transaction were other than open, honest, and fair. . . . The mere fact that he may not have disclosed his assets and liabilities in detail to her, will not, in the absence of anything showing fraud or deceit, invalidate the contract, nor will it raise a presumption of fraudulent concealment; and especially is this so where the terms and provisions of the contract are so manifestly fair and reasonable as in this case." (p. 462.)

In *Casey v. Casey*, 84 Kan. 380, 113 Pac. 1047, it was said:

"That the contract was equitable is not questioned by either party. Our only duty is to construe it. Agreements of this nature are generally regarded with favor and are liberally interpreted to carry into effect the intention of the parties." (p. 382.)

*Gordon v. Munn*, 87 Kan. 624, 125 Pac. 1, is to the effect that if the intended wife had a fair and adequate knowledge touching her future husband's property, and the contract is free from deceit and fraud, it should not be set aside merely because of great disproportion.

In view of these authorities, the question as to the duty to prove knowledge on the part of the wife touching the husband's property depends upon whether or not the alleged contract shows great inadequacy or disproportion. It is clear that the plaintiff and Mr. Watson were well acquainted, and they must have had some knowledge of each other's financial condition. She had been married once, and he, four times. She testified that she had known him thirty-six years. While the record does not give their ages, it is manifest that they were both somewhat along in years. There is in the entire record nothing to indicate fraud, deceit, or any attempt or intent to overreach the woman Mr. Watson had known so long and was about to make his wife, and while there is considerable disproportion, it cannot be said to be so unreasonable as to raise the presumption of fraud. Hence, had the failure fully to inform the plaintiff as to Mr. Watson's property been pleaded, the court would have been justified in finding, as it did, that the contract (if there was one) "was just and equitable."

Therefore, whether the question now so vigorously pressed was sufficiently called to the attention of the trial court or not,

no materially prejudicial error appears, for, on the theory that it was, the evidence supported the finding, and if not, the result should have been the same.

The judgment is therefore affirmed.

---

OPINION ON MOTION FOR REHEARING.

In a motion for a rehearing counsel for the plaintiff present the questions of inadequacy, of homestead, and the rejection of Mr. Ayers' testimony touching the statement of Mr. Watson, all of which have been carefully considered. It is now stated without denial that the defendants had not taken and filed the deposition of the witness. Assuming this statement to be correct—the extensive record being confusing on that point—the second paragraph of the syllabus and the corresponding portion of the opinion are withdrawn. A rehearing is denied.