No. 36,764

In re Estate of Alexander Besse, Deceased. (SAMUEL J. SHRIVER, Executor, etc., *Appellant,* v. HATTIE M. BESSE, *Appellee;* HAROLD U. BESSE et al., *Appellees* and *Cross-appellants.*)

(183 P. 2d 407)

LELAND M. RESLER, judge. Opinion filed July 12, 1947.

*P. E. Nulton* and *R. L. Letton,* both of Pittsburg, were on the briefs for appellant Samuel J. Shriver.

*Carl Pingry,* of Pittsburg, argued the cause and was on the briefs for appellee Hattie M. Besse.

*Douglas Hudson,* of Fort Scott, argued the cause, and *Howard Hudson* and *Douglas C. Hudson,* both of Fort Scott, were with him on the briefs for the appellees Harold U. Besse et al.

The opinion of the court was delivered by.

THIELE, J.: The question presented by this appeal is the validity of a claimed antenuptial contract.

Under date of July 14, 1941, Alexander Besse made his last will

and testament by the terms of which he gave specific devises to his daughters, Lavon Besse and Frances Howland, and to his grandson, W. B. Howland, a specific legacy to his son, Harold, and the remainder of his real estate (without description) and certain personal property to his son, Alden. The will did not contain a general residuary clause. On November 26, 1943, Alexander Besse and Hattie Betts were married. Shortly before the marriage ceremony was performed they executed an instrument in writing hereafter referred to as an antenuptial contract, and which will be more fully referred to later.

Alexander Besse died on May 12, 1944, and shortly thereafter Samuel J. Shriver, named in the will as *administrator*, filed a petition in the probate court for the probate of the will. Although not in the order here stated, the petition set forth the death of Alexander Besse and that he left a will, leaving named persons as legatees and devisees; that he was survived by certain-named persons as his heirs at law, naming his four children and Hattie M. Besse, his widow, subject to the terms and provisions of a certain antenuptial contract, a copy of which was attached to the petition and which is as follows:

"Pittsburg, Kas 11/25/1943

"This agreement. before marriage between A. Besse and Hattie Betts to govern properties owned by them.

"Hattie Betts shall have her property, furniture and other chattels of her own.

"Also will accept a quitclaim deed of 520 W. Kansas and furniture, and A. Besse shall have the use of it during his lifetime and pay taxes.

"A. Besse to reserve all properties in Pittsburg, Picher and real estate and all machinery—personal properties—owned by him.

"Agreed this 25th day of Nov. 1943..

"A. Besse
"Hattie Betts"

Hattie M. Besse filed her answer and cross petition in which she alleged she was the widow of Alexander Besse; that the alleged will was executed prior to her marriage and she knew nothing about its execution; that she denied entering into any valid antenuptial contract with Alexander Besse, had not seen the original document and did not know whether her signature thereon was genuine; that if her signature was affixed to the original agreement it was obtained by fraud. Then follows detailed allegations of fraud. As the evidence is to be later reviewed, these allegations

are here omitted. She further alleged that the antenuptial agreement, even if valid, did not bar her right of inheritance, and that in the event the will of Alexender Besse was admitted to probate, she declined to take under its provisions and elected to take her share of his estate and such other allowances as may be allowed to her, under the law. The prayer was that the antenuptial contract be held for naught and that she be allowed such share and allowances as are by law allowed the widow of a deceased person.

On June 9, 1944, the probate court, upon hearing, admitted the will to probate and appointed Shriver as the executor, and continued the hearing as to the antenuptial contract and the right of the widow to inherit. The trial of this last mentioned issue finally resulted in a judgment of the probate court, holding the antenuptial contract of no effect; that Hattie M. Besse was the widow of Alexander Besse, deceased, and irrespective of his will was entitled to one-half of his estate, and that she was entitled to a certain automobile and the sum of $750 as a statutory allowance to the widow. Following this judgment the parties adverse to the widow appealed to the district court.

At the trial in the district court, it was stipulated that the probate court files, so far as pertinent, were to be considered in evidence, and that the transcript of the evidence in the probate court should be considered in evidence. Some oral testimony was also taken and will be referred to later. The district court made findings of fact generally favorable to the widow, and concluded as matters of law that the signature of Hattie Betts to the antenuptial contract was obtained by fraud and the contract should be held for naught; that the contract by its terms did not preclude her from inheriting the widow's share, and that irrespective of the will of Alexander Besse, his widow was entitled to receive one-half of his estate and the sum of $750 and the automobile as statutory allowances. For reasons hereafter mentioned we need not detail the trial court's findings of fact or conclusions of law.

Following the judgment the parties adverse to the widow filed motions for a new trial and to set aside certain findings of the trial court and its conclusions of law, and these motions being denied, they perfected appeals to this court, their specifications of error covering trial errors, the judgment rendered and the rulings on the motions to which reference has just been made. No error is speci-

fied on any claim that evidence was erroneously admitted or rejected.

In this court, appellants direct our attention to the fact that such oral testimony as was offered in the district court did not involve the antenuptial contract; that the cause was tried in the district court upon the transcript of evidence submitted to the probate court, and that under such circumstances it is the duty of this court to decide for itself what the facts establish, substantially as it would in an original case, citing in support *In re Estate of Kemper,* 157 Kan. 727, 734, 145 P. 2d 103. Application of the rule contended for was made in *In re Estate of Wallace,* 158 Kan. 633, 635, 149 P. 2d 595, and the rule will be followed here. Accordingly we shall summarize the evidence in the same order it was received in the probate court insofar as it is necessary to dispose of the questions presented in appellants' brief, and later mentioned. The following testimony was offered by Mrs. Besse.

Floyd Fowler testified he was the husband of a granddaughter of Mrs. Besse. On Thanksgiving day, November 25, 1943, he saw Mr. and Mrs. Besse at his wife's folks in Independence, Mo. Mr. Besse was there from about 10:00 a. m., until 11:30 p. m. He did not hear them say anything about property owned by Mr. Besse nor any discussion about any contract with reference to their property. On the next day he was in the courthouse in Kansas City, Kan., and saw Mr. Besse at a desk. Mr. Besse called Mrs. Besse over to him. As the witness stood talking to his wife Mrs. Besse came up and handed him a paper (the so-called antenuptial contract) and said, "Here, read this, what is this?" He looked at it and handed it back, saying he could not read it. Mrs. Besse said she did not have her glasses and could not read it and she said to Mr. Besse, "What is that?" to which he replied, "That is to show you I am going to give you our home for a wedding present." Shortly after, all parties present went up to the probate court where Mr. and Mrs. Besse procured a marriage license and were married. Cross-examination developed that the witness had been convicted twice of violation of the liquor laws.

Mrs. Floyd Fowler testified that Mr. and Mrs. Besse were at her mother's home the day before they were married; that she heard nothing said about Mr. Besse's property nor any contract or agreement; that on the day they were married she saw Mr. Besse standing at a counter in the courthouse in Kansas City, Kan., where he

was writing something. Mrs. Besse went over to where Mr. Besse was standing. She went over and Mrs. Besse brought a paper to her husband to read. The witness looked at the paper but couldn't make it out. Her husband handed it back to Mrs. Besse and told her he couldn't read it and she asked Mr. Besse what was in it and he told her he was giving her their home as a wedding present. She did not see her grandmother sign the paper. Shortly after the parties went upstairs where Mr. and Mrs. Besse were married. Mr. Besse had told them the evening before he wanted them to be present at the marriage. Cross-examination of this witness went into some detail about the family of Mrs. Besse and that her second husband, Betts, died leaving some property, concerning which there was litigation.

Hattie Besse, as a witness in her own behalf testified to her marriage to Mr. Besse; that when seventeen years of age she was married to Charles Gedney who died after they had been married forty-five years; that about a year and a half after his death she married Harry Betts who died six years later; that she inherited nothing from Gedney but did inherit some property from Betts (the record discloses Betts died in June, 1940); that she was not able to read without glasses; that she had signed the contract; that the first time she saw it was twenty minutes before she was married; that she did not read the paper before she put her name on it and the contents were not read to her by anyone prior to the time she signed it. She didn't have her glasses on but she believed the paper (contract) was the same one she had handed to Mr. Fowler. No one explained the contents of the paper to her. At the time she was married to Mr. Besse she did not know whether he had a will or not. At the time of marriage she did not know the extent or value of his property and she did not know there was a mortgage on the home until a few days ago. She further testified that at the time of the marriage she did not know the law of Kansas with respect to the right of a widow to inherit, but knew that the widow got a share. She also testified that when her father died in Kansas her mother got half of his estate, and she gave her mother her share of the estate. When this occurred is not stated. Mr. Besse had hay fever and sugar diabetes, but he was out all of the time tending to his business and the morning he died he went to work as usual. At the time of the marriage she owned a property in Pittsburg and a little farm. At the time she signed the paper she did not intend to sign away what rights she might have to inherit from Mr. Besse, and she did

not understand she might be signing away such rights. She signed the paper right after she had handed it to Floyd Fowler. She was cross examined as to her family and further said that she inherited about $2,000 from her second husband in Oregon; that she never knew of any such contract as an antenuptial contract; that when she came back to Kansas she bought her home and little farm; that prior to her marriage to Mr. Besse he told her about his interest in the Besse Hotel. He never discussed that he owned the Colonial Theater but he got complimentary tickets. She did not know until after the marriage about his property. Cross-examination about whether she thought it unusual to sign a paper showing she was to receive a gift, is argumentative and will not be set forth further than to note her answer that if she had had her glasses she would have seen what she was signing.

Mrs. Ray Gedney testified she was a daughter-in-law of Mrs. Besse; that Mr. and Mrs. Besse had Thanksgiving dinner at her home the day before they were married; that Mr. Besse said they were to be married but she heard nothing said about his or her mother-in-law's property; that when they arrived at the courthouse in Kansas City on the following day Mr. Besse was standing at a counter writing something. She didn't hear any conversation with Mr. Besse and did not hear any discussion of any contract or agreement of any kind.

Mrs. Floyd Gedney testified that she was at her sister-in-law's home on Thanksgiving day but did not hear Mr. and Mrs. Besse discuss anything about their money, property or any contract. She was present in Kansas City, Kan., saw Mr. Besse standing at the counter writing but heard no conversation in reference to any paper that was signed.

At a later date further testimony was offered as a defense to the showing made by Mrs. Besse.

Mrs. Ballenger testified that she was employed in the probate court of Wyandotte county on November 26, 1943, and that she attended to a part of the application for the wedding license issued to Alexander Besse and Hattie Betts, and that she remembered that Mrs. Betts signed the affidavit and that Mrs. Betts put on her glasses for the purpose of signing it; that they were tortoise rim glasses and of yellow or tan color. On cross-examination she stated that she was one of six clerks, and all helped in filling out affidavits for marriage licenses which ran between five and six hundred per month,

and that she would fill out a hundred per month. Without details, it may be said she testified positively she remembered Mrs. Betts and that Mrs. Betts took out her glasses to read and sign the affidavit.

Mrs. Myrtle Biles testified that she knew Mr. and Mrs. Besse before their marriage; that in a conversation a month and a half before the marriage they talked about Mr. Besse's property; that Mrs. Betts was "kidding" and she said she thought she was going to catch Mr. Besse, and wanted to know if he had anything, and that witness said he had a good deal of property but it was mortgaged; that later the witness was "kidding" Mr. Besse about getting married and he said if he did get married he was going to let Mrs. Besse have the Kansas property for her lifetime and $100 a month. Cross-examination developed she was indebted to the Besse estate on a real-estate contract, and that she knew a good deal about Mr. Besse's business.

As the result of a good deal of colloquy the probate court admitted the following over the objection of Mrs. Besse: Mr. Shriver testified that he was associated with Alexander Besse in his lifetime and after his death he found an envelope containing the so-called antenuptial contract. During the colloquy Hattie Besse's counsel produced a document headed "Marriage Agreement." It may here be noted this document was not signed by any person. The general purport of the document was that it was made between A. Besse and Hattie Besse; that on November 25, 1943, in contemplation of their intended marriage the parties had executed a temporary agreement in handwriting which provided as follows, and the so-called antenuptial contract was then set out in full; that that contract was not notarized nor recorded, necessitating her joining with him in executing deeds and mortgages on property in which she had no present or contingent interest, and that the parties were desirous of affirming their prior agreement and clarifying their intention, and then follows a detailed provision limiting her rights in his estate and stating that she waived all right of inheritance, the details of which need not be set forth. Between the place provided for signatures and a form for acknowledgment, appeared the following, unsigned statement:

"No, I never will sign such an agreement as this. *Thanks* I am your wife and such I intend to remain, as such until death parts us."

It was admitted in the colloquy mentioned that Mrs. Besse wrote the statement last mentioned. Shriver testified he had typed the

agreement and delivered it to Mr. Besse. Later Mrs. Besse had told him Mr. Besse had brought out a contract for her to sign and she said she was not going to sign it.

By way of impeachment of Mrs. Besse there was offered in evidence a copy of proceedings had in the circuit court of Umatilla county, Oregon, in an action wherein Hattie Betts sued Gerald Betts and others to set aside a certain contract which she alleged she was induced to sign on the representation it set forth her full and complete rights in the estate of her deceased husband, Harry Betts. No copy of this contract is shown and we are not aware of its terms. She prayed that this contract be set aside and that she be decreed the owner of certain property under the laws of Oregon. The record discloses that the matters involved were settled and compromised and the action dismissed. There is no statement as to what the settlement was.

Mrs. Besse was recalled in her own behalf and stated she did not have her glasses with her at the courthouse in Kansas City, Kan., at the time of her wedding, and she denied she had told Myrtle Biles she thought she was going to catch Mr. Besse. On cross-examination she was asked to produce her glasses and the record shows: ".   .   . let the record show that the glasses are of plastic rim, yellow in color—light yellow in coloring." Later Mrs. Ballenger was asked if she recognized the glasses and said, "Not particularly," but in general they were the same.

The inventory and appraisement filed in the probate court showed that at the time of his death Alexander Besse owned seventy-five parcels of real estate and a large amount of corporate stocks and other personal property all appraised at $118,586.98, and that there were liens on the property amounting to $42,000. Subtraction discloses his net worth was $76,586.98. The trial court in its findings of fact found the net value of his estate was approximately $62,000. The record as abstracted does not explain the discrepancy in amounts.

It may further be said that attached to the appellants' brief is a photostatic reproduction of the antenuptial contract. It appears to be written with pencil on a rather small piece of paper. It is not easily read as the penmanship is not good, there are two interlineations, and some writing over other writing. It is conceded that except for the signature of Mrs. Betts the entire document is in the handwriting of Alexander Besse.

In their brief appellants state five questions and argue them in order. In substance they include: 1. At the time the antenuptial contract was made did Mrs. Besse know that a widow was entitled to one-half of her deceased husband's estate? 2. At that time did she know of his substantial property interests? 3. Was her signature to the contract obtained by the fraud of her husband? 4. Was the contract reasonable in its provisions for her? 5. Should the antenuptial contract be construed to the effect that she took no share in her husband's estate except that mentioned in the contract?

Preliminary to discussion of those questions and the argument of appellants in support, we take up briefly some of our decisions applicable to the situation generally.

In *Watson v. Watson,* 104 Kan. 578, 180 Pac. 242, it was held an antenuptial contract must be upheld unless fraud, deceit or unreasonable inadequacy or disproportion appeared, but if the latter did appear, a presumption of fraud is raised and the burden is on the husband or those claiming under him to show the wife was fully informed.

In *McVicar v. McVicar,* 128 Kan. 394, 278 Pac. 36, it was recognized that a surviving spouse may bar or limit her statutory right of inheritance by an antenuptial contract, many of our decisions being cited. But it was also stated that to be valid, such a contract must be understandingly and fairly made.

In *In re Estate of Cantrell,* 154 Kan. 546, 119 P. 2d 483, it was held that the validity of antenuptial contracts would be upheld where such contracts are fairly and understandingly made, are just and equitable in their provisions and are not obtained by fraud or overreaching.

In *In re Estate of Garden,* 158 Kan. 554, 148 P. 2d 745, in discussing antenuptial contracts it was said:

"Where they are fairly and understandingly made, and just and equitable in their provisions, and free from fraud and deceit, they are valid and enforceable." (l. c. 560.)

More recent decisions stating the same general principles are *Fincham v. Fincham,* 160 Kan. 683, 165 P. 2d 209, and *In re Estate of Hill,* 162 Kan. 385, 176 P. 2d 515.

All of the decisions above noted contain reference to many others not noted, but all are to the same effect.

Notwithstanding the division made by appellants' statement of questions, we are of opinion the primary matter which should be

discussed is whether the contract was fairly and understandingly made or whether it was executed as a result of the fraud of Alexander Besse. Appellants direct our attention to *Hoard v. Jones,* 119 Kan. 138, 237 Pac. 888, where it was held that:

"When a party voluntarily signs and delivers an instrument affecting property rights, and thereafter seeks to refute it on the ground of fraud of the other party thereto which induced its execution, such fraud should be made clearly to appear before the instrument is declared invalid." (Syl. ¶ 1.)

And in effect argue that having signed the contract, the burden was on the widow to make it "clearly to appear" that she was defrauded, and that her evidence did not sustain that burden. It may here be noted that appellants' evidence did not cover anything connected with the preparation or execution of the antenuptial contract.

Limits of space do not permit an extended discussion of each particular item of evidence of the appellee mentioned by the appellants. It is said that the best evidence whether Hattie Besse's signature was obtained by fraud or whether she knew the contents of the antenuptial contract previous to signing it, is contained in the instrument itself; that her explanation for not reading the contract was that she did not have her glasses with her; that the latter was disproved by the testimony of Mrs. Ballenger, and, in effect that Hattie Besse's statement as to what happened in the Wyandotte county courthouse is not to be believed. Floyd Fowler's testimony is atttacked and said to be ample proof of his interest in aiding the grandmother of his wife, and it is said his criminal record speaks for itself in exhibition of his credibility. Appellants also stress the fact that Hattie Besse, by reason of the Oregon lawsuit, would not have signed a document without reading it; that Hattie Besse must have appreciated the fact that she did not have to sign any paper to show she was receiving a gift from her prospective husband. Appellants also directed our attention to the proposed unsigned "Marriage Agreement" and to Hattie Besse's notation thereon and argue that if Alexander Besse had obtained the contract of November 25, 1943, by fraud, he would not have had effrontery to present the second agreement to her. Attacks are made on other parts of the evidence adduced on behalf of Hattie Besse, and it is said that the charge of fraud is wholly predicated upon her charge she did not have her glasses with her, and that the failure of the evidence to sustain her contention that she did not have her glasses leaves the fraud charge without any support.

Our review of all the evidence bearing on the execution of the antenuptial contract, summarized above, leads us to the conclusion that the matter may not be determined simply by deciding whether Hattie Besse did or did not have her glasses with her at the time the contract was presented to her. There is abundant evidence, besides that of Hattie Besse, as to the manner in which her signature was obtained. Floyd Fowler's statement of what occurred is not only not inherently improbable but is supported directly by the testimony of his wife, and indirectly by the testimony of other witnesses, and by the antenuptial contract itself. Certainly the testimony does not show that whatever it may have been that Alexander Besse was writing at the desk in the courthouse when the other people arrived, was the particular antenuptial contract Hattie Besse was asked to and did sign, but that contract on its face shows that it was not carefully prepared, it is rather illegible, contains interlineations, writing over other writing and bears that much indicia it had been hastily prepared. The document tends to verify Floyd Fowler's statement as to why he couldn't read it and tell Mrs. Besse what it was. But that is not all. Whether Hattie Besse did or did not have her glasses and that we need not decide, she did ask her prospective husband what the document was, and upon his explanation that it was to show a gift to her, she signed it. Her testimony is corroborated by that of Floyd Fowler and his wife and the testimony of the wife is not criticized in any manner. Nor can we agree that simply because Floyd Fowler may have violated the liquor laws, he is so wicked that he cannot tell the truth about a matter in which he has only a very remote interest, if indeed, he has any interest at all; and this is especially so where his testimony is entirely consistent with the other testimony and with all the surrounding circumstances.

From the manner in which this case reaches us, we determine the facts from the printed page. We have not seen the witnesses. We cannot be unmindful, however, that the witnesses were all personally present in the probate court, and the court concluded that the antenuptial contract was obtained by fraud.

A survey of the entire record discloses that within a short time prior to the marriage, and at a time when the contracting parties occupied positions of confidence and trust to each other (see *In re Estate of Garden,* supra) the execution of the antenuptial contract was obtained. Under the facts and circumstances as disclosed by the evidence and which need not be repeated, that contract was not

fairly and understandingly made, but its execution was obtained by fraud. Mrs. Besse sustained the burden of proving her case, and made it "clearly to appear" that the antenuptial contract should be declared invalid.

In view of the conclusion just expressed we need not discuss the other questions suggested by the appellant, for it follows that if there was no valid contract, Hattie Besse would have such rights in her deceased husband's estate as the law provides. There is no question but that she duly filed an election to take under the law and not under the will.

The judgment of the district court is affirmed.

HOCH, J., not participating.

BURCH, J., dissents.