No. 43,144

In the Matter of the Estate of Leslie O. Gillen, Deceased. NETA CLAIR GILLEN, *Appellant,* v. MARSHALL GILLEN, Executor of the Estate of Leslie O. Gillen, *Appellee.*

(380 P. 2d 357)

Opinion filed April 6, 1963.

*Harry W. Saums,* of Wichita, argued the cause and *Robert T. Stephan* and *Eugene L. Pirtle,* both of Wichita, were with him on the briefs for the appellant.

*Enos E. Hook,* of Wichita, argued the cause and *John H. Gerety* and *Sidney L. Foulston, Jr.,* both of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

JACKSON, J.: In this case we have a widow attempting to show that the antenuptial contract, which she admits was entered into before her marriage to her late husband, did not bind her after her husband's death and that she is entitled to claim her interest in the husband's property under the laws of Kansas.

Mrs. Neta Clair Huckleberry and Leslie O. Gillen, both of whom had been married before, became engaged to be married in January, 1960. Some time in March of the same year Mr. Gillen took Mrs. Huckleberry to the office of his lawyer Mr. John Gerety, where Mr. Gerety read aloud to them a proposed antenuptial contract. We must assume that Gillen had talked with his bride-to-be about such a contract before this talk with Mr. Gerety.

Mr. Gerety handed to Mrs. Huckleberry a copy of the contract to take with her and urged that she obtain independent legal advice. Mr. Gerety also told the parties that each should give the other a statement of the property owned by them. The wife says this was done by Mr. Gillen sometime during the month of March in Mr. Gerety's office.

On April 26, 1960, the parties signed a completed antenuptial contract and Mr. Gerety made certain that Mrs. Huckleberry had a complete copy of the final contract. Mr. Gillen and Mrs. Huckleberry were married on April 30, 1960. Mr. Gillen died on July 16, 1961. He left a will which he had executed March 25, 1959, more than a year before he was married.

The Gillen estate is shown by the inventory as having total assets of $152,578.82. Mrs. Gillen's estate was of no substantial amount.

The antenuptial contract did provide that the wife might have a life estate in the homestead of the parties. The wife now says that there will be no way for her to pay taxes and repairs on the house and that she will have insufficient income to enable her to live in the home.

The executor in this case makes no secret of the fact that the contract in this case is based upon the contract approved in the case *In re Estate of Neis*, 170 Kan. 254, 225 P. 2d 110. True in the Neis case the wife received a legacy of $15,000 which Mrs. Gillen did not receive but there is no question that Mrs. Gillen was fully advised concerning the contract she signed and was advised concerning her prospective husband's property. She was advised to obtain independent legal advice but chose not to do so. She had a full copy of the contract before signing it and was enough of a business woman to know what she was doing.

In a later case, *In re Estate of Ward*, 178 Kan. 366, 285 P. 2d 1081, the wife asserted overreaching by the seventy-two year old husband—a matter which Mrs. Gillen does not seem to assert—but we upheld the contract saying in the first syllabus of the case:

"Where it appears that an antenuptial contract was understandingly made and freely executed, and where there is an absence of anything showing fraud or deceit, the mere fact the intended husband did not disclose in detail to the intended wife the nature, extent and value of his property will not, of itself, invalidate the contract or raise a presumption of fraudulent concealment, and if from a consideration of all the facts concerning the situation of the parties, such as their respective ages, family conditions, property rights, etc., at the time the contract was made the trial court concludes the intended wife was not

overreached, the contract should be sustained (following *In re Estate of Cantrell*, 154 Kan. 546, 119 P. 2d 483)."

Other cases with similar holdings are: *Hafer v. Hafer*, 33 Kan. 449, 6 Pac. 537; *Watson v. Watson*, 104 Kan. 578, 180 Pac. 242; *In re Estate of Cantrell*, 154 Kan. 546, 119 P. 2d 483; *In re Estate of Place*, 166 Kan. 528, 203 P. 2d 132; and *In re Estate of Schippel*, 169 Kan. 151, 218 P. 2d 192.

The instant case gets down to the point that although Mrs. Gillen was quite adequately advised of the provisions of the contract, she was quite effectively cut off without anything from her husband's estate. All she received was her right in the homestead which the husband could not deny to her. (See *In re Estate of Neis*, supra, p. 264 *et seq.*)

On the other hand, it would seem hard to find a case where a woman was better advised of her rights by her prospective husband and his attorney.

Turning to *In re Estate of Cantrell*, supra, at page 551, we find the following:

"Using as a premise that under the instant contract Mrs. Cantrell was to receive no part of her husband's property and therefore she received no equitable share of her husband's estate, it is contended the evidence fails to show that those claiming under the husband sustained the burden of showing that Mrs. Cantrell was fully informed as to the nature, extent and value of the Cantrell's estate at the time the contract was made, and hence the contract must be stricken down. The argument ignores in part that portion of the particular holding in the Watson case that the contract must be upheld unless fraud, deceit or unreasonable inadequacy appears.

"The general rule in this state is that contracts, made either before or after marriage, the purpose of which is to fix property rights between a husband and wife, are to be liberally interpreted to carry out the intentions of the makers, and to uphold such contracts where they are fairly and understandingly made, are just and equitable in their provisions and are not obtained by fraud or overreaching. (See *Dunsworth v. Dunsworth*, 148 Kan. 347, 352, 81 P. 2d 9, and cases cited.) Generally speaking, such contracts are not against public policy, although a different rule obtains where the terms of the contract encourage a separation of the parties. (*Neddo v. Neddo*, 56 Kan. 507, 44 Pac. 1.) It may here be said that there is nothing about the present contract which warrants application of the last rule.

"In *Hoard v. Jones*, 119 Kan. 138, 150, 237 Pac. 888, a review of many of our decisions was made and it was said that while good faith should characterize such contracts, they are not only recognized, but are favored by the law when fairly and intelligently made and when just and equitable in their provisions, and that some force and effect must be given to contracts voluntarily executed.

"A leading case in this state is *Hafer v. Hafer*, supra. There a widower fifty-six years of age, with a family of seven children, and worth $14,000, made an antenuptial contract with a maiden lady twenty-six years of age who had $40 and two cows. Under the contract the intended wife was to receive a child's share. At the husband's death his property was worth $19,000. In that case it was contended the contract was void because it was not shown the husband had made disclosure of his financial condition. After discussing the good faith of the contract, the situation attending its execution, etc., and calling attention to the fact there was no claim the husband had misrepresented to or concealed from his intended wife his financial condition and that she had never expressed complaint or dissatisfaction, it was said:

" 'The mere fact that he may not have disclosed his assets and liabilities in detail to her, will not, in the absence of anything showing fraud or deceit, invalidate the contract, nor will it raise a presumption of fraudulent concealment; and especially is this so where the terms and provisions of the contract are so manifestly fair and reasonable as in this case.' (1. c. 462.)

"If the statement from the Watson case heretofore quoted is to be interpreted as appellant argues, and because no provision is made for the prospective wife, there is such presumption of fraud the entire burden of establishing the contract is on those claiming under the husband, the interpretation is too broad, for other circumstances must also be considered. Unreasonable inadequacy of a provision for the intended wife, or disproportion of the share she will receive, cannot be concluded from the contract alone. What is inadequate or disproportionate can only be determined from a consideration of all the circumstances. Not only is the amount of the husband's property a factor—consideration should be given to the situation of the parties, their respective ages, as compared to each other, their respective property, their family ties and connections, and the whole circumstances leading up to the execution of the contract and their marriage, the question in the end being whether, in view of all the facts, the intended wife was overreached. The cases cited above and those mentioned in them make that clear. And we think that consideration may also be given to the actions and conduct of the parties following the marriage as tending to show the agreement was fairly and understandingly made."

We can but feel that the wife in the case at bar had an opportunity to understand and was capable of understanding the contract to a greater degree than the wife in the Cantrell case. Here whatever Mrs. Gillen did not understand would seem to be largely her own fault. As said in the above quotation, antenuptial contracts are favored if it appears they have been understandingly made. It would be difficult to say that in this case Mrs. Gillen did not understand what the contract amounted to at the time she signed it.

Since that was true, and since she was urged to obtain independent legal advice and did not do so, it would seem that the trial court should be affirmed. It is so ordered.