No. 44,042

In the Matter of the Estate of L. A. West, Deceased. R. A. Cox et al., *Appellants*, v. MAMIE WEST, *Appellee.*

(402 P. 2d 117)

Opinion filed May 15, 1965.

*Morris Moon,* of Augusta, argued the cause, and was on the brief for the appellants.

*L. J. Bond,* of El Dorado, argued the cause, and *Robert M. Bond,* of El Dorado, was with him on the brief for the appellee.

The opinion of the court was delivered by

WERTZ, J.: This was a proceeding to determine the validity of an antenuptial contract entered into between L. A. West and Mamie Hall (hereinafter referred to as Mamie) and the consent to the last will and testament of the decedent signed by Mamie after the two were united in marriage. The trial court found the documents to be null, void and of no binding effect and that Mamie West was entitled to one-half of the estate of the decedent in addition to the homestead and statutory allowances, and entered judgment accordingly. The executors have appealed.

We first take up and discuss the evidence with respect to the background of events and the circumstances in connection with the drawing and execution of the instruments.

L. A. West and Mamie Hall were life-long residents of Augusta. Mamie had known West all her life. At the time of their marriage on April 23, 1961, West was a widower 76 years of age and Mamie was a maiden woman 57 years of age. During his lifetime Mr. West was engaged in the real estate business and successfully amassed an estate valued in excess of $460,000. In 1928 Mamie returned from college to take charge of the operation and management of the family business known as Hall's Decorative Shop,

which she has successfully operated continuously ever since, her net worth being between $95,000 and $100,000. The business locations of the two parties were adjacent, and through the years West and Mamie had become close friends as well as business associates. Mamie assisted West in his business affairs as bookkeeper for a number of years, and prior to their marriage helped him keep a record of his bank account and had been authorized by him to draw, and did draw, upon his account for certain purposes.

In the early part of 1961, as a result of their close association over the years, Mamie and West discussed marriage. West then informed R. A. Cox, an attorney, of the contemplated marriage. Cox had been well acquainted with West and Mamie for many years, having represented them individually in their respective business affairs and joint business transactions, and had previously prepared and drafted Mamie's will. Shortly after informing Cox of his intentions West was hospitalized with pneumonia for a period of seven weeks. While West was in the hospital he and Mamie again discussed getting married, and after his release from the hospital West again spoke to Cox about the contemplated marriage and discussed matters with respect to a property settlement between the two parties. At West's request Cox prepared an antenuptial contract, a will for West and the consent thereto for the signature of Mamie, and on April 18 West and Mamie went to Cox' office at which time he gave each a copy, which they carefully read, of the antenuptial contract he had prepared which protected the rights of both parties to their respective property in case of the death of either. Cox told them the contract would cause the statutes relating to descent and distribution of property to be superseded as to their respective rights, and he read certain pertinent portions from the proposed agreement. He also advised Mamie about her rights in the absence of such agreement and its effect in case of marriage and that the consent to the will could not be signed until after the marriage.

The antenuptial agreement, in pertinent part, reads:

"This Agreement made and entered into by and between L. A. West, Party of the First Part, and Mamie Hall, Party of the Second Part, Witnesseth:

"That Whereas, a marriage contract is under contemplation and is about to be entered into by and between the parties hereto, and

"Whereas, each of the parties hereto have and own certain property, real and personal, and each of the parties hereto desire that the property owned by him or her shall remain separate and be subject to the sole control and use of its owner during the continuance of said marriage and that upon its

*termination by death or otherwise each party hereto shall not assert nor make any claim of right, title or interest in the property of the other, except as hereinafter provided, and*

"Whereas the parties hereto and each of them *have been fully advised and have full knowledge of what their right under the law of the state of Kansas would be in and to the property of the other if married without an agreement made with reference to said property before said marriage, and*

"Whereas, the party of the first part desires to make provision for second party for the use during her lifetime of certain of his property hereinafter described should she survive him as his widow.

"Now, Therefore, *for the purpose of settling all questions as to the right of each or either of aid parties hereto in and to the property of each of them* during the continuance of said marriage and upon the termination of said marriage by death or otherwise, and in view of said marriage and for and in consideration of the promises, covenants and agreements herein contained, it is agreed by and between the parties hereto and they and each of them do hereby promise, covenant and agree to and with each other, as follows:

"(*a*) That second party [Mamie] shall have upon the death of first party [West] and that first party by his will shall provide and give second party the use and benefit of the following described property, to-wit:   . . ."

The property consisted of the home and the furniture therein and two business buildings in the city of Augusta.

". . . for and during her natural life should she survive the party of the first part as his widow.

"(*b*) That each of the parties hereto may and shall, during the continuance of said marriage so agreed upon as aforesaid and after its termination by death or otherwise, separately own, use and, subject to the provisions in paragraph 'A' aforesaid, convey and dispose of all property of every kind, belonging to him or her before said marriage or acquired by him or her during the continuance of same, and all income and profit therefrom, to whomsoever he or she shall choose, all in the same manner and to the same extent that he or she now can or then could have done had such marriage not taken place, and in the event either party hereto desires to convey, encumber or dispose of his or her property or any part of same, subject to the provisions of paragraph 'a' above, and it is necessary to execute deeds or mortgages thereon, the other party hereto agrees to join in the execution of any and all instruments for said purpose.

"(*c*) *Each party hereto agrees to consent in writing to any will executed by the other and the disposition of his or her property as in said will set forth,* Provided that the will of first party shall make provision for second party as set forth in paragraph 'a' above, and upon such will being offered for probate the surviving party hereto will elect to take under said will and not under the law of the State of Kansas relating to descents and distributions, it being agreed by and between the parties hereto that upon the death of either, the survivor shall not have and will not assert any claim of right, title or interest under the laws of any State because of such survivorship in or to the property left by the other except as provided in paragraph 'a' above.   . . ."   (Emphasis supplied.)

The agreement was executed and then notarized by Mr. Cox. Six days elapsed between the signing of the antenuptial agreement and the marriage. On April 24, the day following the marriage, the will of L. A. West was executed by him and the consent annexed thereto was executed by Mamie in accordance with the provisions of the mentioned contract. The pertinent provisions of the will are as follows: Paragraph 1 of the will provides for the payment of West's debts and funeral expenses; paragraphs 2, 3, 4, 5 and 6 make specific bequests to third parties; and paragraph 7 gives to Mamie a life estate in the homestead and the two business properties, as set forth in the antenuptial contract, the remainder going to his trustees subsequently named in the will. The residue of his estate West leaves to his named trustees for charitable purposes specified in the will.

The annexed consent to the will reads as follows:

"I, Mamie West, wife of L. A. West, the testator in the foregoing will, hereby acknowledge and certify that *I have read said will and understand the contents thereof and the provisions therein made for me* and I hereby consent that my husband, L. A. West, dispose of his property as set forth in said will and bequeath and devise away from me more than one-half of his property, and I hereby elect and consent to take under the provisions of said will in lieu of the statutes of the State of Kansas relating to descents and distributions. I further certify and acknowledge that this consent is *of my free choice and election with full knowledge and understanding of my rights under the laws of the State of Kansas.*

"Dated this 24th day of April, 1961.

"Mamie West"
(Emphasis supplied.)

Mamie read the will and the consent before she signed the consent. The signing was done in the presence of Fannie and Dan Parks. The attestation clause reads:

"Subscribed by the said Mamie West, wife of L. A. West, in our presence and in the presence of her husband and at the same time *declared by her to be her free choice and election with full understanding of her rights under the laws of the State of Kansas relating to descents and distributions,* and in attestation whereof we have hereunto subscribed our names as witnesses at the request of said Mamie West, in her presence and in the presence of each other this 24th day of April, 1961.

"Fannie Parks
"Dan Parks
"Witnesses"
(Emphasis supplied.)

L. A. West died September 12, 1962, approximately seventeen months after the execution of the antenuptial contract, the will and the consent thereto. West's will was admitted to probate October 17, 1962, and Mamie perfected an appeal to the district court where the case was heard on the issue only of the validity of the antenuptial contract and the consent to West's will.

Throughout the presentation of the case Mamie maintained she did not realize what she had signed nor did she realize the full import of it. She stated she was not aware of the contents of the antenuptial agreement and consent, with understanding, until after Mr. West's death. She also stated she had not seen the antenuptial agreement prior to the meeting in Cox' office and that she did not consult another attorney, even though she knew she could have had she wanted to, for she trusted her husband and Mr. Cox. Mamie stated that had she known the effect of the antenuptial agreement upon her rights at the time she signed it, she would not have done so. She maintained that at the time of the execution of the antenuptial agreement she was not furnished information concerning the property owned by West and did not know the full extent of the property owned by him. She related that in a conversation had between West and herself in her home prior to the drawing of the antenuptial agreement West stated he was not going to give her his entire estate.

The full extent of the advice given by Mr. Cox to Mamie at the time of the execution of the consent to the will is not shown by the record, although Cox testified that at the time the antenupital contract, the will and consent thereto were prepared by him he felt he was representing both West and Mamie.

Noah Morris, executive vice president of the Prairie State Bank of Augusta, testified that Mamie had restricted authorization to issue checks on West's bank account, and that during the first part of August 1962, just a month prior to West's demise, the bank refused to make payment of a check drawn by Mamie payable to herself for $100,000, notwithstanding her authorization. Mamie did not controvert this evidence nor did she offer any explanation or make any attempt to explain this withdrawal.

Upon the evidence presented, the trial court found, in pertinent part, that R. A. Cox served as attorney for Mr. West on many occasions and had also previously acted as attorney for Mamie; that the antenuptial contract was prepared by Mr. Cox from infor-

mation supplied by West and prior to the execution of the contract it was probable that Cox told West and Mamie the agreement would supersede the law of descent and distribution, and made some mention that without the agreement in the event of marriage neither could will away more than one-half of his or her property without the consent of the other; that at the time of the execution of the agreement Mamie was not furnished information concerning the property owned by West and that she did not know the *full* extent of the property owned by him *although she knew he was wealthy;* that the will was signed by L. A. West and the consent thereto by Mamie, and both attested by Dan and Fannie Parks as witnesses; that prior to the execution of the will and consent thereto Mamie read the will and consent but was given no further advice concerning her rights nor advised of her rights to the homestead and family allowances.

The court further found:

"6. Although Mr. Cox testified that he considered he was representing both parties in the matter, it does not appear that his services were of any benefit to Mamie West, but were of value only to L. A. West. Mamie West was not advised to seek independent counsel concerning the contract or the will.

"7. The exact amount of property owned by Mamie West in her own right has not been shown by competent evidence, but it appears that she had considerable property of her own and may have been worth as much as $95,000 or $100,000 when the contract and will were executed."

It was also the finding of the court that Mamie received under the will property rights of the value of far under $24,000, the exact value being difficult to ascertain; that the provisions of the antenuptial contract and will involved were disproportionate and inadequate as to the rights conferred on Mamie West; and

"10. In view of the failure of the decedent to fully inform Mamie West as to the extent of his property, in view of his failure to advise her to seek independent counsel, in view of the position of confidence in which Mamie West was placed with relationship to decedent, and in view of the proximity of the marriage, which would naturally tend to cause a bride to be reluctant to question the acts of her intended or newly-acquired husband, it is the finding of the court that the antenuptial contract and consent to the will were not freely understandably made on the part of Mamie West and were not just and equitable as to her."

The court concluded as a matter of law, based on the mentioned findings, that the antenuptial contract and the consent of Mamie to the will were void and of no binding effect.

The question before this court is whether the findings of the trial court, that the antenuptial contract and the consent to the will resulted in a disproportionate and inadequate distribution to Mamie, and the failure of the decedent to fully inform Mamie as to the extent of his property or advise her to seek independent counsel, are sufficient as a matter of law to support the trial court's judgment.

While the trial court found in finding No. 6 that it did not appear the services of Cox were of any benefit to Mamie, this finding is not sustained by any evidence in the record and is wholly contrary to the evidence. An examination of the contract itself reveals that Cox protected Mamie's separate property to the extent of approximately $100,000; that under the contract, should Mamie have preceded West in death, West could not have inherited any of Mamie's property. Moreover, Cox had previously drawn Mamie's will, and subsequent to the marriage advised her she should have another will prepared, but she stated that she did not see any necessity for it.

It would appear Mamie knew her estate was protected from West in the event she preceded him in death. It cannot be said that Cox' services to Mamie were of no benefit. It is apparent he was acting as her attorney as well as West's attorney at the time of the preparation of the instruments. Moreover, the fact the court found that Mamie was not advised to seek independent counsel concerning the contract or the will becomes immaterial inasmuch as her former attorney was the scrivener of the mentioned instruments and she admitted she knew she could have sought independent advice of counsel had she wanted to, but she trusted her husband and Mr. Cox.

The rules governing the construction of contracts generally are applicable to the construction of antenuptial contracts. (*In re Estate of Brown,* 189 Kan. 193, 368 P. 2d 27; *In re Estate of Hill,* 162 Kan. 385, 176 P. 2d 515.) This court, after a careful analysis of our previous decisions, set forth the general rules relating to antenuptial contracts in *In re Estate of Cantrell,* 154 Kan. 546, 119 P. 2d 483, stating:

"The general rule in this state is that contracts, made either before or after marriage, the purpose of which is to fix property rights between a husband and wife, are to be liberally interpreted to carry out the intentions of the makers, and to uphold such contracts where they are fairly and understandingly made, are just and equitable in their provisions and are not obtained by fraud or overreaching.

"Where it appears that an antenuptial contract was understandingly made and freely executed, and where there is an absence of anything showing fraud or deceit, the mere fact the intended husband did not disclose in detail to the intended wife the nature, extent and value of his property will not, of itself, invalidate the contract or raise a presumption of fraudulent concealment, and if from a consideration of all the facts concerning the situation of the parties, such as their respective ages, family conditions, property rights, etc., at the time the contract was made the trial court concludes the intended wife was not over-reached, the contract should be sustained." ( Syl. ¶¶ 1, 2. )

The above rules are again stated in *In re Estate of Gillen,* 191 Kan. 254, 255, 256, 380 P. 2d 357; *In re Estate of Schippel,* 169 Kan. 151, 164, 218 P. 2d 192; *In re Estate of Place,* 166 Kan. 528, 203 P. 2d 132; *Hafer v. Hafer,* 33 Kan. 449, 6 Pac. 537.

There appears to be no question but that Mamie freely and voluntarily entered into and executed the antenuptial agreement and signed the consent to West's will.

Was the mentioned antenuptial contract disproportionate and inadequate as to Mamie, as found by the trial court? The finding that Mamie received under the will property rights valued far under $24,000 was not in strict accord with the evidence. The testimony was that the life estate in the homestead was appraised at $15,000, the furniture therein at $3,000 and the life estate in the two business properties at $9,000, or a total of $27,000.

Long ago in *Gordon v. Munn,* 87 Kan. 624, 125 Pac. 1, it was held that if the intended wife is competent to make a contract and has a fair and adequate knowledge concerning the future husband's property when she enters into an antenuptial agreement which is free from deceit and fraud, it should not be set aside merely because the court or jury finds that the provision made for her is in great disproportion to his property. (*Hafer v. Hafer,* supra; *Watson v. Watson,* 104 Kan. 578, 586, 180 Pac. 242.) In *In re Estate of Cantrell,* supra, it was stated:

"Disproportion of shares, where property is to be shared, would and should challenge attention, but disproportion is not the sole test, especially where it is shown there is no active concealment or fraudulent representation by either party, and the contract is made freely to carry out an understanding previously made." (p. 553.)

It is not contended, nor is there any evidence in the record, and the trial court did not find, that West misrepresented or concealed anything about his property or that he misled or deceived Mamie in any particular. Where a party voluntarily signs an

antenuptial contract and thereafter seeks to refute it on the ground its execution was obtained by fraud, such fraud must be made to appear clearly before the contract may be declared invalid. (*In re Estate of Ward*, 178 Kan. 366, 285 P. 2d 1081; *In re Estate of Schippel*, supra; *Shriver v. Besse*, 163 Kan. 402, 183 P. 2d 407.)

Moreover, there is no contention by Mamie or any evidence in the record of any deceit, fraud or overreaching, and the trial court found none. In *In re Estate of Schippel*, 169 Kan. 151, 218 P. 2d 192, it is stated:

"In determining whether such an agreement was fairly and understandingly made, just and equitable, and free from fraud and deceit, courts should take into consideration all of the surrounding facts and circumstances, including the ages and station in life of the parties, their background of experience and education, their knowledge or lack thereof concerning the property of the other, the amount and nature of the property of each, and existing obligations, if any, to those persons who, by virtue of relationship or otherwise, through the years have earned a right to share in the estate of either of the parties." (Syl. ¶ 4.)

It must be remembered this is not a case of an elderly, experienced businessman entering into a marriage contract with an inexperienced young woman but with a college-trained, sophisticated businesswoman who had accumulated considerable wealth during her business career. The parties to the contract had been engaged in joint business ventures and Mamie had aided West with his business affairs for many years. The fact that West did not disclose to Mamie the nature, full extent and value of his property would not, of itself, invalidate the contract or raise a presumption of fraudulent concealment, and under the facts in the instant case it cannot be said as a matter of law that the provisions of the contract and the will were disproportionate and inadequate as to Mamie.

The contract, the consent to the will and the attestation clauses thereto glaringly show, as testified to by Cox and as found by the trial court, that Mamie had been advised of her homestead and statutory rights before she freely executed the instruments which she now seeks to avoid long after the lips of her deceased husband have been finally sealed. Moreover, on August 4, while West was in the hospital, Mamie executed a check for $100,000 drawn on West's bank account made payable to herself which the bank failed to honor for some reason not material herein. This act, coupled with the further fact she told Mr. Cox she did not need

to draft another will, realizing that her property was properly protected by the contract, negates her statement that she did not know the full force and effect of the contract and consent to the will until after the death of her husband.

In *In re Estate of Ellis*, 168 Kan. 11, 29, 210 P. 2d 417, it was stated:

"It may be conceded that in many of our decisions, stress is laid on the fact that the consenting spouse was not advised as to his or her rights under the statutes pertaining to descents and distributions, but in those cases that knowledge, or lack of it, went to the question whether the consent there involved was freely and understandingly given; but it follows that if a review of the circumstances shows that the consenting spouse was fully aware of the estate of the other, and of the disposition made in the will, knew for some period of time that the particular disposition was to be made, made no effort to inform herself, made no protest to documents of testamentary disposal and her consent thereto being prepared and without making any effort to ascertain her rights, executed the consent, it must be held either that she acted intelligently or that she was willing to act unintelligently. . . ."

Other conclusions of law not narrated herein need not be treated inasmuch as they were not within the issues presented to the trial court and should be set aside.

After a careful examination of the record, and in light of what has been heretofore said, we find that the pertinent findings of fact do not warrant the conclusions of law reached by the trial court. Therefore, the judgment of the trial court is reversed and the cause is remanded with instructions to set aside its judgment and enter judgment in favor of the appellants in accordance with the views herein expressed.

It is so ordered.