No. 37,093

In the Matter of the Estate of Frank Frederick Benso, Deceased (CECELIA BENSO POLCYN, MAE BENSO MARONDE, EDWARD WARD BENSO, FAYE BENSO BEVERIDGE, MARJORIE BENSO HARBAUGH and FRANK F. BENSO, and LEAL E. ANSCHUTZ as Administrator of the Estate of FRANK FREDERICK BENSO, deceased, *Appellants*, v. ALVINA STEINERT BENSO, *Appellee*).

(199 P. 2d 523)

Opinion filed November 13, 1948.

*Jerry E. Driscoll,* of Russell, argued the cause, and *Oscar Ostrum,* of Russell, was with him on the briefs for the appellants.

*Clifford R. Holland,* of Russell, argued the cause, and *Herbert Diets* and *Boyce P. Hardman,* both of Great Bend, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This was an appeal from the probate court to the district court from an order made for the distribution of property upon the final settlement of a decedent's estate. The controversy was between the widow of the decedent and his children by a former marriage, as to whether there was a valid antenuptial agreement between the widow and decedent which was in effect at the time of his death and which should be taken into account in the distribution of the estate. The probate court held against the children on that point and they appealed to the district court, where there was a trial and a judgment to the same effect. The children have appealed from the judgment of the district court; also the administrator of the estate has appealed.

In this court appellee moved to dismiss the appeal of the children upon the ground that the abstract of the record was not filed in this court within four months after the notice of appeal was filed in the district court, as required by G. S. 1947 Supp. 60-3312. We think the statute is procedural rather than jurisdictional and does not prohibit this court, upon a proper showing, from extending the time for filing an abstract, and such extension was made in this case. The motion to dismiss the appeal by the children is denied.

Appellee also moved to dismiss the appeal by the administrator upon the ground that he had no interest in the controversy between the litigants, hence could not be a "person aggrieved" within the meaning of G. S. 1947 Supp. 59-2404, and had no authority to appeal. In his final account the administrator informed the court:

" 'That the children of said decedent assert and claim that distribution of said estate should be made under the terms and provisions of a certain antenuptial agreement . . .' and that the 'widow of said decedent, claims a one-half interest in said estate under the laws of descents and distributions, and in addition thereto such exemptions as may be allowed to her under the laws of the state of Kansas'."

Both sides filed with the court pleadings setting out their respective contentions as to how the property should be distributed. Thereafter the administrator filed an answer to one of the claims in which he alleged:

"According to his best information, knowledge and belief, that said Ante-Nuptial Agreement, with all of its terms and provisions, was in full force and effect at the time of the death of said Frank Frederick Benso and alleges that distribution of said estate should be made in accordance with the terms thereof."

In doing this the administrator took one side of a controversy which concerned him not at all. In *Hauser v. Estate of Doyle*, 143 Kan. 719, 56 P. 2d 1217, the court had occasion to say:

"Insofar as the administrator is concerned, it is no concern of his who the true heirs may be, . . . The duty of the administrator is to collect the assets of the estate and administer them under the statutes and orders of the probate court, and ultimately distribute them to the persons found entitled." (p. 725.)

The point was again treated to the same effect in *Cardin v. Apple*, 150 Kan. 162, 92 P. 2d 32; *In re Estate of Doyle*, 152 Kan. 23, 30, 102 P. 2d 52, and in *Anderson v. Carder*, 159 Kan. 1, 4, 150 P. 2d 754. These statements are in harmony with the general rule.

In 4 C. J. S. 373 it is said:

"An executor or administrator may not secure review of a judgment, order or decree merely determining the rights as between the parties entitled to the estate or distributing the estate or a part thereof among heirs, next of kin, devisees, or legatees, where the court had jurisdiction, unless there are exceptional circumstances taking the case out of the general rule."

And in 2 Am. Jur. 960, it is said:

"An executor or administrator, as such, is not, however, aggrieved or prejudiced by a decree or judgment as to the rights of the beneficiaries, and therefore, cannot appeal from a decree affecting their interests. In accordance with this rule, it is held that an administrator is not entitled to appeal from a decree of distribution."

The administrator's statement in his final report of the respective claims of the parties was proper. It was improper for him later to take sides. He is not concerned with the contest between heirs which they litigate at their own expense and on their own behalf. His appeal, therefore, is dismissed.

The facts, concerning which there is little or no dispute, leading up to the controversy may be stated briefly as follows: Frank F. Benso and his first wife had lived for some time in the vicinity of Gorham, in Russell county. They were the parents of six children. His wife died in 1927. Soon thereafter his oldest daughter, who was ill with arthritis, and her husband lived with him and his younger children for a time. While doing so the son-in-law employed Alvina C. Steinert, a girl about sixteen years old, of German descent, whose home was in Rush county, to assist with the housework and the care of his wife. She worked there several weeks, then went to work for a family named Mitchell, who lived in the vicinity. A few months thereafter Frank F. Benso began to court

her. The courtship continued for about a year, when they became engaged to be married. On May 20, 1931, Frank F. Benso went to the office of an attorney in Russell, advised the attorney of his contemplated marriage and the fact that he had children by his first wife and a substantial amount of property, and at his request the attorney prepared the antenuptial agreement which later became the subject of controversy in this action. In short, it provided that in the event of his death prior to that of his second wife that she should not receive any of the real property he owned at that time, but should receive her share under the law of descents of any real property thereafter acquired and of any personal property which he owned at the time of his death. The visit to the office of the attorney was late in the afternoon. The attorney dictated the agreement and while his secretary was writing it Mr. Benso went to the Mitchell home and got his intended bride and took her to town with him. On the way he told her that there were some papers to be signed which would not be good if they lived together as long as two years. When they reached the office of the attorney the papers were explained to her by the attorney and the contract was executed by both of them in duplicate. It appears both copies were given to Mr. Benso and that the attorney placed an unsigned copy in his files. A few days later they went to Salina and were married and returned to the Benso home, where they lived together until the death of Frank F. Benso intestate on May 14, 1943. At the time of their marriage Mr. Benso was fifty-eight years of age and his bride Alvina was nineteen. He was a man of considerable business experience. He had been for some time and was then a director of the Gorham State Bank and of the Farmers Grain and Mercantile Company of Gorham, was township trustee of his township, and had been active in business and politics in his community. He was the owner of 820 acres of land, a substantial part of which was farmed and the remainder used as pasture. The place was well improved and stocked and equipped for farming and stock raising. His bride had no property other than her personal effects. She had attended school until she was about sixteen years of age, but had reached only the sixth grade when she quit and went to work. The only work she had ever done was about the home, as a child, and as a domestic in the Benso and Mitchell homes. She had never previously signed any important contract or transacted any important business. At the time of the marriage the names and ages of the

children of Frank F. Benso were as follows: Cecilia Benso Polcyn, thirty years; Mae Benso Maronde, twenty-eight years; Edward Ward Benso, twenty-seven years; Faye Benso, now Faye Benso Beveridge, twenty-four years; Marjorie Benso, now Marjorie Benso Harbaugh, eighteen years, and Frank F. Benso, Jr., fifteen years.

Mrs. Polcyn and her husband were at the Benso home and remained there for about six months. The other three younger children were at home. Faye continued to live at the home until her marriage in April, 1935. Marjorie continued to live at the home until her marriage in September, 1935, and Frank F. Benso, Jr., continued to live at the home until his marriage in 1936. The home life was a happy one prior to the death of Frank F. Benso. Alvina got along well with all the members of the family, and though the children and she were somewhat estranged after his death they still spoke well of her as being capable, industrious and agreeable.

After the death of Frank F. Benso his children and the widow began looking for a will. The children also were looking for the antenuptial contract which the widow said had been destroyed. After thorough search neither instrument could be found. Upon the widow's application, after due notice, Leal E. Anschutz was appointed and qualified as administrator of the estate. Details of the administration need not be stated. On April 25, 1946, the administrator filed his petition for final settlement and distribution. With it was the final account of the administrator showing a cash balance in his hands of $11,130.19, the 820 acres of land, and some mineral deeds upon the land. Apparently the attorney who drew the antenuptial agreement made the unexecuted copy which he had placed in his files available to the children, who used it as the basis of their claim that it should be taken into account in the distribution of the estate.

In the district court the issues were joined by the pleadings so that the children of the decedent contended the antenuptial agreement was in full force and effect at the time of the death of Frank F. Benso, and that its provisions should govern the distribution of the estate. The contention of the widow presented the question of whether she ever signed the contract. She alleged she signed some instrument on May 20, 1931, but did not know the nature of the instrument or its exact terms; that she was a minor and had no independent advice; that she had never ratified it; that she disaffirmed it immediately after the death of her husband; that the

contract lacked mutuality and was unjust and inequitable; that the contract had been destroyed by Mr. Benso, and that thereby she was released from its terms.

The trial court made full findings of fact from which the above statement of uncontradicted facts was taken. It also found that the antenuptial contract was executed on May 20, 1931, and that prior to its execution Miss Steinert was orally advised by the attorney who prepared it as to her rights as a wife under the law and as to the effect of the contract, and specifically found:

"She received no copy of the agreement at the time and the evidence does not show that she ever had a copy in her possession."

The court also specifically found:

"No executed copy of the ante nuptial agreement has been found and the court concludes from the evidence that they have been destroyed."

The court also found that the widow:

". . . has continuously since the death of Frank Frederick Benso stated and claimed that she was not bound by the terms and conditions of any agreement made and executed between her husband and herself prior to their marriage, and that she was entitled to take and receive the widow's share of said estate under the laws of Descents and Distribution of the State of Kansas."

In the conclusions of law the court placed the basis for its judgment for the widow upon one point, stated as follows:

"In the eyes of the law, Alvina C. Benso was a minor when she entered into this contract. Under the statute, G. S. 38-102, she had a right to disaffirm it within a reasonable time after attaining her majority. This she did upon the death of Frank Frederick Benso and she was not barred from so doing by any provision of law or equity urged against her. No one has been prejudiced in any way by her delay in asserting this right. Suppose she had disaffirmed the contract within 2 years from the date of her marriage instead of waiting some 12 years to do so. Can the appellants say that this would have placed them in any more favorable position with respect to their father's estate? Certainly not, unless it might be assumed that such action would have brought about a divorce between the contracting parties and that their father would not remarry, would retain his property, and should die intestate or leave it to them by will."

The judgment of the trial court was in favor of the widow, holding that she was entitled to one-half of the real and personal property. The children have appealed. Their counsel argue several questions pertaining to antenuptial contracts which are quite academic so far as applied to this case and may be considered without analysis. It is argued that the appellee became of legal age upon her marriage to Mr. Benso a few days after the execution of the

antenuptial agreement. This may be conceded. It is further argued that a minor is bound by his contracts unless disaffirmed within a reasonable time after reaching majority. This may be conceded. In fact, the trial court so recognized in its judgment. It is argued that the widow's attempted disaffirmance of the contract after her husband's death was not within a reasonable time. The trial court expressed the view that appellants were not hurt by her delay. Appellants do not attempt to show in what way and to what extent they suffered any injury by reason of a delay in the disaffirmance of the contract. In this connection they do discuss the statute of limitations and laches. The antenuptial contract never was recorded, hence laches, rather than the statute of limitations, is to be considered. In passing upon this matter the court quoted from *Bowie v. Stonestreet, et al.,* 6 Md. 418, 432, 61 Am. Dec. 318, where the court said:

"To say that because a wife does not institute proceedings promptly against her husband, to enforce against him her equitable claim, she is to be considered as guilty of such gross laches in prosecuting her rights, or of such long and unreasonable acquiescence in the assertion of adverse rights, that equity will refuse to interfere in her behalf, is to establish a principle but little calculated to preserve the peace and harmony which should exist between husband and wife. What is said in 1 Story's Eq., sec. 1520, in regard to the effect of lapse of time, or the staleness of claims, in a court of equity, we do not think is properly applicable to such a case as this. A wife declining to sue her husband, cannot, with propriety, be said to be guilty of gross laches in prosecuting her rights, or of unreasonable acquiescence in the assertion of adverse rights."

This case is cited and quoted from in 121 A. L. R. 1382 on applicability of statutes of limitation or doctrine of laches as between husband and wife, the quotation being at page 1402, where other cases are annotated on the same point. The court also cited *Hinze v. Hinze,* 76 Kan. 169, 90 Pac. 762, 12 L. R. A., n. s., 493, and the authorities therein, as being in accord with the view expressed in the Maryland case. In view of the quite unusual success of the marriage, as shown by the evidence and found by the court, we are unable to say, as a matter of law, that by the disaffirmance of the contract after the death of her husband she was guilty of laches.

There is, however, another point, possibly less debatable, upon which the court might well have rested its judgment. The court specifically found and concluded from the evidence that the executed copies of the contract had been destroyed. The widow testified they were destroyed and that she saw her husband tear them

up and burn them. Objection was made that the witness was incompetent to testify to it on the ground that it was a transaction with deceased. The court ruled, and we think properly, that she was not testifying to a transaction, but to what she observed. In this court there is no contention that the evidence was improperly received. Standing alone, if believed by the court, it was sufficient to sustain the court's findings. However, there was other evidence tending to establish the fact that Frank F. Benso had intentionally destroyed the executed copies of the antenuptial contract. Mr. Floyd L. Kirkman was an attorney at Russell. He was well acquainted with all the parties to this action. On the New Year's eve before Mr. Benso's death Mr. Kirkman had a party of friends at his home, among them Frank F. Benso and his wife and some other persons. In the evening, when some of the young folks were dancing and visiting, Mr. Benso engaged Mr. Kirkman in conversation near the hall door for fifteen to thirty minutes. Mr. Kirkman testified:

"He (Mr. Benso) said, 'You know I have an agreement with Alvina made before we were married,' and he said 'In that agreement she wouldn't get enough,' and he said, 'I want you, and I don't want anybody but you, to draw a will for me.'

"He mentioned many things, not all pertaining to the drafting of his will or this agreement he had had with his wife. He mentioned how hard she had worked, and he said that, with regard to that agreement, he said he either had destroyed it, was destroying it, or was going to destroy it. That is my best recollection. I can't say which one he said. He said one of those, or words to that effect."

Later Mr. Benso attempted to contact Mr. Kirkman on at least two occasions to have Mr. Kirkman make his will, but they did not get together on it and there is no evidence that any will ever was made.

It is well settled under the authorities that the parties who make an antenuptial contract such as the one here involved may destroy it and thereby annul it, if they desire to do so. (See 26 Am. Jur. 913 and 41 C. J. S. 583, and authorities there cited.) Our decisions are in accord: *Gordon v. Munn*, 87 Kan. 624, 125 Pac. 1; *Hoard v. Jones*, 119 Kan. 138, 237 Pac. 888; *Pattison v. Pattison*, 129 Kan. 558, 283 Pac. 483.

We find no error in the record. The judgment of the trial court is affirmed.

SMITH, J., not participating.